## ASSOCIATED REALTY COMPANY *v.* CADILLAC JACK ENTERPRISES, INC.

[No. 261, September Term, 1967.]

*Decided June 28, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*William O. Goldstein* for appellant.

No brief filed for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Once more we are engrossed in the arbitrament of a wrangle between a real estate broker and his customer. The trial judge, Carter, J., ordered the broker to return $3,500 of an $8,000 deposit he had retained as his commission. We shall affirm Judge Carter's action.

"Cadillac Jack" is the nom de guerre of Wilbur F. Haugh, who claims to be the sole owner of appellee,[1] a once prosperous used car business in Harford County which he conducted on a 10 acre tract situate on the east side of U. S. Route No. 1 (Belair Road) about 3 miles south of Belair. Pressed by creditors, Haugh, in October 1963, commissioned appellant (Adler)[2] to find a purchaser for the property. He executed one of the printed Standard Listing Contract forms (first making minor revisions) of the Real Estate Board of Greater Baltimore (the Board) giving Adler authority, for 3 months only, to sell the property for $185,000. The listing contract was solicited by Verl J. Edwards (Mrs. Edwards), an employee of Adler. Adler said Mrs. Edwards was a personal friend of Haugh and had known him for 20 years. In February 1964, the October listing having expired, a new listing contract was signed by Haugh. This was for 6 months. The sale price ($185,000) remained the same. Nine months later, in October 1964, Haugh signed still another listing contract on the same terms, except that its duration was for 3 months instead of 6 months.

It should be remembered that each of the 3 listing contracts provided that Adler's commission was to be based on the "Standard Schedule of Commissions" (the Schedule) promulgated by the Board, which is set forth, in part, below:

> "(a) Improved Commercial and Industrial Property (including retail store properties, office buildings

---

1. The charter of Cadillac Jack Enterprises, Inc., was forfeited in October 1959, revived in April 1965, forfeited in November 1966, and again revived in May 1967.

2. Appellant is owned by Hyman J. Adler.

and apartments) : 6% on the first $50,000, 5% on the next $450,000, and 3% on the balance in excess of $500,000.

"(b) Special Utility and/or Special Effort Properties—Theatres, churches, wharf properties, abbatoirs, mill properties, dairies, laundries, distilleries, breweries as well as special effort properties: $7\frac{1}{2}\%$; higher rates may be charged not in excess of 10% when specified in the original employment agreement or listing contract."

The October 1964 listing contract expired on 18 January 1965. At or about that time Mrs. Edwards persuaded Winston B. Osborne, to whom she had shown the property some months earlier, to offer $80,000 for it. He gave her a down payment of $500. She returned to the office and saw to the preparation of the agreement of sale, in which Osborne agreed to pay an additional $7,500 upon the execution of the agreement by the seller, Haugh. The agreement required the seller to pay Adler a commission "in accordance with the [Board's] Schedule." Also included in the agreement was a provision that it contained "the final and entire agreement between * * * parties * * * and [that] neither * * * [of them] shall be bound by any terms, conditions or representations not [t]herein written." She obtained Osborne's signature and the agreement was then sent to Haugh.

The record is silent in respect of what, if anything, happened between the signing of the agreement of sale by Osborne and a meeting which was held at Karson's Inn on Holabird Avenue on 28 January 1965. Present at the meeting were Haugh, a young woman said by some to be his "girl friend" and by others to be his nurse, Adler, Mrs. Edwards, John T. Smith, whom Haugh identified as vice president of the appellee, and Mrs. Smith. No minutes of this meeting appear in the record but one's first guess would be that the principal item on the agenda was the disparity between Haugh's asking price of $185,000 and Osborne's offer of $80,000. The record suggests that Haugh was not in the best of moods, at the time, and that he may have been somewhat difficult; not without reason it seems. Dur-

ing 1963 and 1964 he had been treated at Spring Grove State Hospital for alcoholism. Judgments against him amounted to about $85,000. His business had gone down the drain and he seems to have suspected that Adler's failure to obtain a better offer was more the result of indifference and inertia than any lack of marketability of his property.

After what Adler described as a "big hassle" Haugh signed the agreement of sale and the following statement written in longhand on a "Cadillac Jack" letterhead (the addendum) :

"Jan. 28, 1965

'I, Wilbur F. Haugh, trading as "Cadillac Jack Enterprises, Inc.," signed the attached contracts with the understanding that said contracts must meet the approval of John T. Smith vice president of said corporation.

'It is understood and agreed that Associated Realty Company, agents for "Cadillac Jack Enterprises, Inc." and Wilbur F. Haugh will as agents and through their attorney Mr. Heath contact each creditor and settle said outstanding obligations in the most advantageous manner.

'I want 25,000.00 net for complete settlement on final signature.

By Wilbur F. Haugh

? { $20,000.00 } ?
{ To 25,000.00 }

"John T. Smith
Associated Realty Co.
Verl J. Edwards, Agt."

Adler contends there was a "verbal" agreement for a 10% commission. "He [Haugh] was not only going to give ten percent, he was going to give us a thousand dollars [3] to pay the attorney to compromise these deals." Asked why he didn't "get a written contract" providing for a 10% commission, Adler said, "I guess because we were stupid; we assumed there

---

3. This was the only mention of a fee to be paid to Adler's counsel.

wouldn't be any question about it." The following excerpt from the cross-examination of Adler is revealing:

> "Q. All right. Now you say this ten percent contract is a verbal contract, as you put it, when did this arise?
>
> "A. As far as I was concerned it never arose, it was an understanding.
>
> "Q. You are saying you got a ten percent verbal contract, is that what you say?
>
> "A. From Mrs. Edwards.
>
> "Q. When did you get it?
>
> "A. When we first got the contract.
>
> "Q. In October? [1963]
>
> "A. When she gets on the stand you can ask her."

Mrs. Edwards specifically denied that she had any negotiations with Haugh or with anyone else concerning commissions. She said a 10% commission was discussed at the 28 January meeting but she was "not positive as to any definite decision on it." We quote from the cross-examination of Mrs. Edwards:

> "Q. Now you say the subject of commissions arose at that time? [28 January meeting]
>
> "A. It was discussed. Of course I had no right to enter into the discussion because I was not the broker involved.
>
> "Q. Do you recall who brought up the discussion?
>
> "A. Mr. Adler brought up the discussion.
>
> "Q. And what did he claim as to towards commission, he said he was entitled to ten percent?
>
> "A. Yes.
>
> "Q. And what was the response from Mr. Haugh?
>
> "A. Mr. Haugh kept saying "no, no, no, no."

Daniel Wagner, a certified public accountant and a member of the bar, testified he was engaged by Haugh "to see [the] settlement through." He said he undertook negotiations with Haugh's creditors and succeeded in reducing the liens from $85,000 to about $61,000. He had trouble accomplishing this, he said, because the creditors were upset and unhappy. They

had been irritated by the earlier approach of another person (either Adler or Mrs. Edwards). He (Wagner) telephoned Adler several days before the settlement to learn how much of the $8,000 deposit would be "forthcoming from Associated Realty at the date of settlement." Asked what had been Adler's reaction he said:

> "A. He indicated to me that this was not so, that the commission would be ten percent and that *if the commission of ten percent was not agreed to* he would take his prospective purchaser that signed the contract into another property and that the sale would not go through." (Emphasis supplied.)

When he reported this, Haugh told him there had been talk (at the 28 January meeting) about a 10% commission but that even assuming such an agreement, which he denied, it would have been contingent upon his walking away from the settlement with $25,000, "after all expenses of settlement including commission had been taken care of." Haugh said, "Don't settle; don't give them ten percent commission." Because Haugh "was under pressure and * * * wanted funds—any funds he could get" Wagner said to him:

> "The proper thing to do is to go through with the settlement peacefully and let them take the ten percent; they are bonded real estate company, then, if in fact you are entitled to a reduction because of this contract being in effect, you will be able to sue in a court of law to recover your refund."

Adler, on the other hand, claims Wagner telephoned him a few days before settlement and said, "I'm not getting enough money out of this deal. You will have to cut your commission. If you don't cut the commission there won't be any deal." Adler said he told Wagner, "We are going to stand pat" and that "a little bit later" Wagner called back and said, "All right, we will go through with it, everything is O.K."

The closing was held at the office of John E. Clark, Esq., in Belair on 14 April 1965. Mrs. Edwards presented to Mr. Clark a receipted bill for $8,000. Mr. Clark remarked, she tes-

tified, that since the "commissions are paid * * * [he would not] enter it on the settlement sheet." Haugh was not present at the settlement but he was said to be in the vicinity. The "settlement statement" indicates that $18,257.11 was paid to Wagner who, after deducting his compensation, handed over to Haugh $17,000. Haugh promptly (25 May 1965) filed suit in the Superior Court of Baltimore City to recover $3,500 from Adler, conceding, in effect, that Adler was entitled to the commission set forth in subsection (a) of the Schedule. The case was tried before Judge Carter, without a jury, on 1, 2 and 3 May 1967. In this appeal no brief was filed on behalf of Haugh nor was there any appearance for him.

## I.

Judge Carter had "no difficulty in determining that there is no satisfactory evidence of any oral agreement relating to commissions for the sale of this property." After commenting on the meeting of 28 January, he said:

> "The only thing that I can make out of that is that Mr. Adler was asking for ten percent and Mr. Haugh was saying 'no,' or perhaps qualified his negative response by saying 'All right, I will give you ten percent provided I receive the net amount of $25,000,' or, perhaps, according to this one Exhibit, it might have been $20[000] to $25,000. The fact is, he didn't get that much, so even if he gave, what I term a qualified consent to a ten percent commission, he did it on a condition that didn't occur."

If in this record there is any support for an oral agreement to pay a ten percent commission it must be found in the testimony of Adler. Haugh denied any such arrangement. There is nothing in Wagner's testimony to support it and Mrs. Edwards' testimony falls short of establishing it. Even Adler's testimony contains inconsistencies which impair its credibility. As earlier noted, he testified at one point that the "verbal" (oral) arrangement concerning commissions was made by Mrs. Edwards when she "first got the contract" in October 1963. It seems very odd indeed, if that were the case, that none of the three listing con-

tracts contained any reference to it, especially in light of the Real Estate Board requirement that "higher rates may be charged not in excess of 10% *when specified in the original employment agreement or listing contract.*" (Emphasis supplied.) Even more curious is the retention in the (printed) agreement of sale of the provision binding the seller to pay a commission to "Associated Realty Company" (typed in) in accordance with the Board's Schedule. Elsewhere in his testimony Adler insisted the "verbal" agreement was made at the 28 January meeting at Karson's Inn. We think Judge Carter's comment just about hit the nail on the head and it follows, of course, that we cannot say he was clearly erroneous. Maryland Rule 886 (a).

## II.

We turn now to the question whether there was a written contract for the payment of a 10% commission. We understand it to be conceded that on 18 January 1965 all of the listing contracts had expired. Since we have agreed there is no support for an oral agreement it is clear that any written agreement must be found in the agreement of sale and the addendum.[4] Nothing could be more obvious than the fact that the agreement of sale refers only to the Board's Schedule. It is equally obvious that Haugh was painfully aware of the fact that the liens ($85,000) would consume the proposed sale price ($80,-000), leaving no cash for him. The addendum makes it clear that his execution of the agreement of sale was conditioned upon his walking away from the settlement with $25,000. It was up to others to reduce the liens to an amount which might make this possible. There is nothing in the addendum about commissions. It seems incredible that, after a meeting lasting 3 to 4 hours, Adler and Mrs. Edwards would have been content to leave unsettled the amount of the commission especially if they expected to receive more than the amount stipulated· in the agreement of sale. Judge Carter was not in error when he said he could "arrive at only one conclusion, that the commission was payable on the basis" of the Schedule.

---

4. Answering a motion for the production of a written instrument, Adler, in July 1965, said "the written agreement [is] in the possession of" Mrs. Edwards.

## III.

Falling back on his second line of defense, Adler contends that, while he may not be entitled to 10%, he is entitled, at least, to 7½% because this is a "Special Effort Property" as provided in the Schedule. Judge Carter found "no evidence * * * to suggest * * * that this is a Special Effort Property." While we think there is perhaps some evidence along that line it is certainly not enough for us to say that Judge Carter's conclusion is erroneous. It does not appear that the property was ever shown to anyone but Osborne and, it seems, it was shown to him on only one earlier occasion. If Wagner is to be believed, the solicitation of lien creditors by Adler or Mrs. Edwards was unsuccessful; indeed neither of them claimed any success in this regard. In fact, Wagner said, they so irritated the lienors that his efforts in that direction were made very difficult. We think Adler had the burden of showing that more time and effort were required, and expended, than would have been involved in an ordinary sale. He has not met that burden.

## IV.

The gist of Adler's final contention is that Haugh, by completing the settlement, is estopped from claiming the return of any part of the $8,000. Adler did not use the word "estoppel" but it is clear that he is relying upon it. Adler insists he has paid Mrs. Edwards her share of the commission (60% of $8,000) but this is not borne out by the testimony. Mrs. Edwards flatly denied receiving her share. In fact, she says, Adler owes her $12,000. Judge Carter referred that aspect of the case to one of the court auditors to take testimony, examine the accounting records and to make and submit his findings. This record indicates the matter is still pending. Of course, if Adler really had paid Mrs. Edwards her $4,800 there might be some force to his estoppel argument. However, since it does not appear, on this record, that his position has worsened, that defense is not available to him.

*Judgment affirmed. Costs to be paid by the appellant.*