SELLNER *v.* MOORE, ET AL.

[No. 339, September Term, 1967.]

*Decided November 14, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, McWILLIAMS, FINAN and SMITH, JJ.

*Russell W. Shipley,* with whom were *DeBlasis & Kahler* on
the brief, for appellant.

*Lance W. Billingsley,* with whom were *Nylen & Gilmore* on
the brief, for appellees.

McWILLIAMS, J., delivered the opinion of the Court.

And again "we are engrossed in the arbitrament of a wrangle
between a real estate broker and his customer." *Associated
Realty Co. v. Cadillac Jack Enterprises, Inc.,* 250 Md. 371,
372, 243 A. 2d 543 (1968). The trial judge, Bowie, J., sit-
ting without a jury, entered a judgment for $51,509.06 in favor
of appellees (Moore)[1] against appellant (Sellner) on 6 Sep-

---

1. The partnership, consisting of Andrew Moore and Henry
Moore, Jr., trading as Moore and Moore Real Estate, has been

tember 1967. We have thought it desirable to relate the facts in some detail. They are not controverted.

Sellner, who, at the time of trial, was 91 years old, a widower and "very hard of hearing," acquired, in 1925, a 94.5 acre tract in the Oxon Hill section of Prince George's County, upon which, until recently, he had resided. In May 1958 the United States took about 20 acres of his property and, as a result, access to the remainder (73.05708 acres) was destroyed. The National Park Service then issued a *revocable permit* giving him access to his property over land owned by the United States. Sellner was unaware of the revocability of the permit.

During 1961, Sellner's daughter, Violet Hendsley, was approached "many times" by a fellow employee, Duel Smith, about buying her father's property. Smith, in his spare time, was a salesman for Moore. Mrs. Hendsley told Smith on each of these occasions that her father was not interested in selling his property. Early in 1962, however, Sellner began to show some interest in selling. On 10 March 1962 Moore obtained a listing agreement signed by Sellner. The handwriting on the printed form is Moore's but it is not clear whether the listing was obtained by Smith or Moore since there is evidence that Moore had never met Sellner. The listing agreement, exclusive for 6 months, discloses an asking price of $15,000 per acre and a willingness to accept a first trust for 75% of the purchase price, payable in 10 equal annual payments plus interest at 6%, the first payment to be due *one year* from the day of settlement.

On 2 May 1962 Moore and Smith presented to Sellner for his signature a contract of sale which had been signed the day before by A. R. Minchew, a builder, well known to Moore and for whom Moore had been selling some houses. Moore testified that he prepared the contract, that he dictated it to a secretary no longer in his employ and whose name he could not remember.

The contract, typewritten and single-spaced, is on two sheets of plain legal size white paper. It recites the receipt from A. R.

---

dissolved. Andrew appears not to have participated in this transaction. All dealings with Sellner and Minchew were handled by Henry whom we shall treat as the appellee.

Minchew of $5,000 "in the form of a check" to be applied as a "part payment" on the purchase of approximately 75 acres at $9,000 per acre. Of the total price of $675,000, Minchew agreed to pay $168,750 in cash and give a first trust for the balance. The terms of the first trust as set forth in the contract are interesting. The due date is 11 years later. No interest is payable during the first year. The first principal payment is postponed for 2 years. Any land can be released at the rate of $12,000 per acre. Prepayments are unlimited, without penalty and must be applied to "the next succeeding curtailments due." Subordination is required to *"any bona fide construction and/or permanent loan or loans placed from time to time upon the subject property or any portion or portions thereof."* The trustee is required "to release land to be dedicated for public use such as for streets, public utilities, sanitary sewer, water, storm sewer, etc. * * * without curtailment and at no cost to the purchaser." (Emphasis added.)

The contract further provides that the "purchaser and/or his agents" are to be given the right to enter upon the property "at any time prior to settlement for the purpose of surveying, engineering and such other work as they deem desirable or necessary * * *." Sellner is required to convey the property to whoever might "be designated at settlement." Settlement *"shall be one year from the date of acceptance"* of the contract. *"Assessments for improvements [except Washington Suburban Sanitary Commission improvements] completed prior to the date * * * [of the contract], whether assessment therefor has been levied or not shall* be paid by the Seller or allowance made therefor at the time of transfer." (Emphasis added.) *See Morris v. Ehlers,* 211 Md. 23, 124 A. 2d 776 (1956). Commissions are provided for in the following paragraph:

> "The seller recognizes Moore and Moore Realtors as the agent negotiating this contract and agrees to pay 6% of the sale price for services rendered herein, same to be due and payable upon the settlement of this contract. The entire deposit shall be held by Moore and Moore Realtors until settlement hereunder is made and the party making settlement is hereby authorized and directed to deduct the aforesaid

commission from the proceeds of the sale and pay same to said agent. The agent hereby agrees to the within commission provisions and acknowledges receipt of the above deposit but assumes no responsibility for the condition of the property or for the performance of this contract by any or all parties hereto."

Near the end of the second page it is stated that "this contract is a revision of a contract dated April 25, 1962, as requested by the seller." Mrs. Hendsley said Sellner "didn't like the amount of years that was on it [the April contract] because of his age." There is nothing else in the record bearing on the 25 April contract. We shall assume that the only difference between it and the May contract was that the term of the deed of trust described therein was longer than 11 years.

Moore testified that after Sellner had signed the contract Minchew "asked him not to run it [the $5,000 check] through the bank" and that sometime thereafter Minchew brought him $2,000 in cash which he put in his escrow account. Moore kept the check in his file. Minchew, he further testified, was supposed to bring him the remaining $3,000. This Minchew never did nor does it appear that Moore ever again asked him for it. The testimony suggests that Minchew did not have the $3,000. It is interesting and, perhaps, not without significance that on 31 March 1967, less than 3 months before the trial, Moore testified, under oath, while being deposed, that he *deposited* the $5,000 check in his escrow account in the National Bank of Washington where the money remained until January 1967 when he withdrew it and returned it to Minchew. At the trial he testified that he did not deposit the check but returned it along with the $2,000 to Minchew. Moore admitted that he did not tell Sellner anything about the check or the $2,000 and that Sellner did not authorize the return of either the check or the money to Minchew.

Either late in 1962 or quite early in 1963 Minchew told Moore that he had conveyed a ½ interest in the contract to Gudelsky Company (Gudelsky). Moore did not make this known to Sellner because he "didn't figure it was important."

Early in April 1963 Moore told Mrs. Hendsley that the clos-

ing would be held at the office of The District Title Company on 30 April 1963. In addition to the settlement officer, on that day, there were present Sellner, his incompetent son, Charles Sellner, Violet Hendsley, Ballard Hendsley, her husband, Moore, Minchew, Isadore Gudelsky and Max Ammerman, Gudelsky's attorney. After the deed had been signed by Sellner, Gudelsky, who, according to Mrs. Hendsley, had been "doing all of the talking," brought up the matter of the revocable right of way. It seems reasonable to suppose that this circumstance must have been known to Moore, Minchew and Gudelsky for quite some time before the settlement, but it is clear that it was news to Sellner. Although all of the papers, including the deed of trust, were executed and although Gudelsky delivered to the settlement officer his company's check for the cash payment (approximately $168,750), the settlement officer was directed by Gudelsky not to disburse anything until the right of way question could be resolved. Sellner was then presented with a letter to the Title Company, prepared in advance of the closing, one of the conditions of which was as follows:

> "Seller shall provide an irrevocable, legal and recorded right of way of a minimum 60 feet width from the subject property to Bald Eagle Hill Road to the East of said property."

This letter was signed by Sellner, Minchew and Gudelsky. We note that Sellner's "revocable right of way" was only 40 feet wide. It is of some interest that Moore did not bring to the settlement either Minchew's check or the $2,000. The record does not disclose whether the Title Company ever cashed Gudelsky's check which, incidentally, included the "$5,000 down payment." Nor do the circumstances of the return of Gudelsky's check (or the money) appear in the record.

The record is not clear as to what efforts were made, or by whom, to obtain the 60 foot right of way. It is clear, however, that they were unproductive. Nor does the record disclose what led up to the execution of the following agreement, dated 1 November 1963, which was prepared by Moore and typed on one of his letterheads:

"Mr. A. R. Minchew, 128 Dranesville Road, Herndon, Virginia and Mr. Isadore Gudelsky, or their attorney representative, 2001 Falls Road, Rockville, Maryland.

"I have not employed Adrian Fisher as my attorney to represent me to get the existing right of way recorded in the Land Records Office of Prince George's County at Upper Marlboro, Maryland located at 6009 Oxon Hill Road, Oxon Hill, Prince George's County, Maryland.

"I am willing to give you up to Five Thousand Dollars ($5,000.00) to get above described right of way recorded in the Land Records of Upper Marlboro, Prince George's County, Maryland, which said recordation right of way must be satisfactory to 'The District Title Insurance,' located at 1413 Eye Street, N. W., Washington 5, D. C. The maximum time from acceptance of this agreement for securing said right of way is ninety (90) days and time is of the essence of this agreement. The cost of above recordation is payable at disbursement from 'The District Title Insurance Company' from the settlement of my property, the purchasers are A. R. Minchew and Isadore Gudelsky, in accordance with a sales contract dated May 1, 1962."

The signatures, except Sellner's, were torn off. Ballard Hendsley testified Moore told them "he didn't think the lawyer * * * [they] had was giving * * * [them] a good job and that he knew a lawyer who could get * * * the right of way [for them] for the sum of $5,000." He said that when the agreement was presented to Sellner it had been signed by Moore, Duel Smith and a lawyer, whose name he didn't know. Moore later tore off the names, Hendsley said, because the lawyer, whose efforts were unsuccessful, "didn't want his name on it."

Isadore Gudelsky died on 17 December 1963. He appears to have been the prime mover in the affairs of the Gudelsky Company and it seems not unreasonable to suppose that the surviving partners were something less than eager to further pursue

the project in concert with Minchew. In any event, according to Mrs. Hendsley, Minchew was in no position to do anything about it without the Gudelsky money, even if the right of way had been obtained.

Things remained in statu quo until 4 November 1964 when the United States filed a condemnation proceeding against Sellner, Minchew and the entire 73 acre tract. On 14 April 1965, pursuant to a petition filed by them, all of the Gudelsky heirs, trustees and personal representatives were made parties defendant but on 29 December 1965 all of them filed disclaimers of "all right, title and interest" in the property. On 21 April 1966 the trustees named in the executed but unrecorded deed of trust disclaimed "all right, title and interest in and to any award made or to be made."

On 28 April 1966 Moore filed in the Circuit Court for Prince George's County the suit which is the subject of this appeal.

On 29 December 1966 Minchew filed a petition in the condemnation case in which he claimed to be "the contract purchaser of" the Sellner property and as such entitled to "just compensation for the expenses ($11,575.65) to which he * * * [had] been put in preparing himself for settlement."

On 15 March 1967 the United States Court ordered the payment to Sellner of $450,000 and denied the claims of all other defendants, including Minchew.

In common with most of the courts of this country we have held that a real estate "broker is a fiduciary." *Silverman v. Kogok,* 239 Md. 71, 76, 210 A. 2d 375 (1965). In his dealings with his employer he "is bound to act *in good faith* and to make disclosures of matters that are material and might affect the action of his employer in the premises." *Coppage v. Howard,* 127 Md. 512, 523, 96 A. 642 (1916). (Emphasis added.) It has been said that the seller "in the employment of an agent to sell his property bargains for the disinterested skill, diligence and zeal of the agent for his own exclusive benefit." *Raisin v. Clark,* 41 Md. 158, 159 (1874). In *Raisin* the Court, speaking through Judge Miller, said also:

> "It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interest of the principal as far as he lawfully may. The seller of

an estate is presumed to be desirous of selling it at as high a price as can fairly be obtained for it, and the purchaser is equally presumed to desire to purchase it for as low a price as he may. The interests of the two are in conflict. *Emptor emit quam minimo potest, venditor vendit quam maximo potest.*[2] But if the same party be allowed to act as agent for both it becomes his interest to have this maxim reversed, or at least to sacrifice the interests of one or both of his principals in order to advance his own by receiving double commissions. *Hence the law will not permit an agent of the vendor whilst that employment continues, to assume the essentially inconsistent and repugnant relation of agent for the purchaser."* Id. at 159-60. (Emphasis added.)

That a broker may forfeit his right to compensation by misconduct, breach of duty or lack of good faith is a proposition which is now well established. *Hardy v. Davis,* 223 Md. 229, 164 A. 2d 281 (1960); *Goss v. Hill,* 219 Md. 304, 149 A. 2d 10 (1959); *Slagle v. Russell,* 114 Md. 418, 80 A. 164 (1911); *Tillman v. Sissel,* 348 S.W.2d 819 (Mo. 1961).

Judge Bowie found "as a question of fact, that even though there was a deviation from the original terms of the sales contract, that such deviation was not material" and that it was "inconsequential." In our judgment his finding is clearly erroneous.

We think Moore's misconduct in respect of the $5,000 "deposit" constitutes, in the circumstances of this case, a breach of duty and a lack of good faith sufficient to defeat his right to compensation and we so hold. Minchew's financial responsibility was surely a matter of considerable importance to Sellner since Minchew had committed himself to the payment of $168,-750, in cash, within a year. Had Moore informed Sellner that Minchew was unable to come up with the $5,000 deposit Sellner might very well have concluded it would be much less likely he would have the $168,750, in cash, a year later. The possible consequences to Sellner are at once apparent and we must sup-

---

2. "The buyer buys for as little as possible; the vendor sells for as much as possible."

pose he would have preferred to rescind the contract forthwith rather than to allow his property to be kept off of the market for a year or longer. Moore's failure to disclose Minchew's default deprived him of that opportunity. And, it should be noted, this situation persisted even up to the trial below. *Cf. Hardy v. Davis, supra; see Murphy v. Brown,* 252 Iowa 764, 108 N.W. 2d 353 (1961). Moore's riposte is that Minchew's financial responsibility, or the lack of it, makes no difference since Minchew had the "right to assign any or all" of his interest in the contract, implying, of course, that an assignee might be an even poorer risk than Minchew himself. But Moore overlooks the language of his own handiwork, the contract of sale, in which Minchew was given the right to designate "assignees" or the name of the person to whom title would have been conveyed at settlement. It is entirely clear, however, that Minchew could not "assign" his personal liability to Sellner for the payment of the deferred balance, $506,200. Moore insists, also, that the entry into the picture of Gudelsky, whose solvency was conceded, disposes of the issue of financial irresponsibility. This might indeed have been the case had the transaction been consummated. However, it is likely the ensuing debacle would never have occurred if Moore had made known to his principal Minchew's shortage of money. In any case, the breach of duty had existed for some time before the appearance of Gudelsky, whose insistence on getting a "60 foot" rather than "the 40 foot" right of way may have been the factor that made consummation impossible.

It is suggested that our recent decision in *Sears v. Polan's 5¢ to $1.00 Store, Inc.,* 250 Md. 525, 243 A. 2d 602 (1968) ought to be controlling here. We do not agree because the facts in *Sears,* while superficially similar, are quite different from the facts in the case at bar. In *Sears* the seller's broker was Carlton L. Foster, Inc. Its agent, Paape, handled the negotiations leading up to the signing, on 25 July 1964, of the contract of sale, which called for Sears to sell to Polan's, for $100,000, a 40 acre tract near Annapolis. $71,000 of the purchase price was to be secured by a purchase money mortgage. Polan's had 90 days to conduct certain tests on the land and 10 days thereafter to apply for rezoning. Settlement was to be within 30 days after a final determination by the zoning authorities. The $5,000

check, payable to Carlton L. Foster (individually), was left with Paape who neither deposited it nor informed the sellers of its existence. On 20 October 1964 Polan's assigned the contract of sale to Paape. A week later Paape applied for the rezoning. In July 1965 Paape assigned the contract to The Paape Development Co., Inc. In November 1965 Paape elected to waive the rezoning provision in the contract and notified Sears he was ready to settle. Thus Sears learned for the first time that Paape was the purchaser. Sears refused to settle and attempted to rescind the contract. Paape filed a bill for specific performance. We affirmed the lower court's decision in favor of Paape.

First off it will be observed that in *Sears* we were not concerned with a broker's suit to collect a commission; Paape's right to specific performance was the only issue; we did not consider his right vel non to commission since the issue was not raised. We held that since the broker's agency terminated with the execution of the contract of sale he was free to act for himself or the opposing party as long as he did nothing to hinder, delay or interfere with the sale. It will be observed also that, while the *Sears* contract provided for a deferred payment of $71,000, it was secured by a first purchase money mortgage, which Sears *was not obliged to subordinate* to any subsequent construction or permanent financing. Nor was the financial responsibility of the buyer, or his assignee, of any concern to Sears since Bernard Polan (president of Polan's and admittedly responsible financially) had agreed personally to guarantee the payment of the mortgage by joining in the execution thereof. Thus it appears that Sears' position did not deteriorate as a result of Paape's conduct. It was not suggested that Paape would be unable to pay at settlement the $29,000 in cash (included in which was the $5,000 deposit). Nevertheless, Judge Finan, for the Court, said:

> "Paape's retention of the check in the file for many months *was certainly a censurable business practice,* however, there is nothing in the record to show that there were insufficient funds in the bank to cover the check on the date it was delivered in escrow or on the proposed settlement date." (Emphasis added.)

In footnote, Judge Finan referred to the fact that Code, Article 56 § 227 A (1968 Repl. Vol.),[3] in the absence of instructions to the contrary, now requires the broker or agent to deposit such funds "expeditiously." It should be noted that when § 227 A became effective, on 1 June 1966, Moore was still holding Minchew's $5,000 check and the $2,000 in cash. He did not then nor did he at any time thereafter "expeditiously deposit" the check, nor did he ever "fully account" to his principal in respect of the disposition of either the check or the cash. However, we do not hold, in the unusual circumstances of this case, that Moore's dereliction in respect of § 227 A, standing alone, would defeat his claim for a commission or endanger his broker's license. Our comment is prompted only by the fact that Judge Finan took note of the statute in *Sears.*

In view of what has been said the judgment of the learned trial judge will be reversed.

*Judgment reversed.*
*Appellees to pay the costs.*

---

3. "§ 227 A. Handling of trust funds.

"(a) In any case in which a licensee hereunder is entrusted with, or receives and accepts, *or otherwise holds,* deposit monies or other trust monies, of whatever kind or nature, or instruments representing the same, such monies or instruments, in the absence of proper written instructions to the contrary, *shall be expeditiously deposited in a bank account maintained by the broker as a separate account for funds belonging to others,* and said funds shall be retained in such account until the transaction involved is consummated or terminated, or until proper written instructions have been received by the broker directing the withdrawal and other disposition of such funds, *at which time all such funds shall be promptly and fully accounted for by the broker.* In no event shall any licensee hereunder commingle any such funds with his own or use any such funds for any purpose other than for which such funds were entrusted to him. (Emphasis added.)

"(b) Failure of any licensee to abide by the requirements of this section shall, in addition to any other penalties provided by law, be sufficient cause for the suspension or revocation of his license, in the discretion of the Commission."