18 A.3d 878

WILKENS SQUARE, LLLP and Stone and Associates, Inc.

v.

W.C. PINKARD & CO., INC. t/a Colliers Pinkard.

No. 23, Sept. Term, 2010.

Court of Appeals of Maryland.

April 26, 2011.

Andrew D. Levy (Melvin J. Sykes and Shelly Marie Martin of Brown, Goldstein & Levy, LLP, Baltimore, MD), on brief, for petitioners.

Jeffrey D. Herschman (Melissa R. Roth of DLA Piper LLP (US), Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

MURPHY, J.

The case at bar presents the question of whether the seller of real property is entitled to refuse to pay an agreed upon fee to the broker who represented the seller, on the ground that the broker was a "dual agent." In the Circuit Court for Baltimore City, W.C. Pinkard & Co., Inc. ("Colliers Pinkard"), Respondent, filed a Complaint in which it asserted that Wilkens Square, LLLP and Stone and Associates, Inc., Petitioners, had breached their agreement to pay the "Advisory Fee" that Respondent earned while acting as Petitioners' broker in the sale of Petitioners' real property located at 300 West Pratt Street in Baltimore. Petitioners then filed a three count Counterclaim in which they asserted that, among other things, "[Respondent] materially breached the Listing Agreement by failing to disclose to [Petitioners] that it had previously entered into the Buyer's Agency Agreement with [Charles McCann Investments (CMC), the purchaser] and was acting as a dual agent for both [the purchaser] and Wilkens Square."

At the conclusion of a jury trial, the jury awarded $226,321.67 in damages to Respondent, and rejected Petitioners' counterclaim. In *Wilkens Square, LLLP, et al. v. W.C. Pinkard & Co., Inc. t/a Colliers Pinkard*, 189 Md.App. 256, 984 A.2d 329 (2009), the judgments entered on those verdicts were affirmed by the Court of Special Appeals. Petitioners then filed a petition for writ of certiorari, in which they requested that this Court answer three questions:

(1) Is it a "dual agency" where a broker provides "real estate brokerage services" as a paid consultant to a real estate investor seeking to purchase commercial real estate in a market and simultaneously represents the owner of a commercial real estate for sale in that market requiring disclosure to the seller?

(2) Does the principal who was kept ignorant of a dual agency bears the burden of proving the dual agency prejudiced it?

(3) Does the fiduciary duty that a real estate broker owes to a principal include any obligation to disclose relationships

with other principals it represents in separate but related matters?

We granted the petition. 412 Md. 689, 990 A.2d 1046 (2010). For the reasons that follow, we agree with the Court of Special Appeals that (1) "it is questionable whether there was any legally sufficient evidence of dual agency in this case; and if there was any at all, the jury [was entitled to decide] as a matter of fact that a dual agency did not exist," and (2) "[t]here simply was no evidence of any other 'material fact,' *i.e.*, a fact that reasonably would have had an impact one way or the other upon [Petitioners'] decision to sell the property to CMC, that [Respondent] had a duty to disclose, but did not." 189 Md.App. at 281, 984 A.2d at 344. We shall therefore affirm the judgment of that Court.

## Background

The opinion of the Court of Special Appeals includes the following summary of material facts:

Colliers Pinkard is a commercial real estate broker in Baltimore City.... The Colliers Pinkard principals primarily involved in the transactions at issue here were Philip Iglehart and Dennis Malone. CMC is an investment company, based in Ireland, that in 2004 began looking to purchase commercial property in the Baltimore City/Washington, D.C. area. Its local representative and lawyer is Patrick Donnelly. Wilkens and its principal, Daniel Stone, were members of a limited partnership that owned 300 W. Pratt Street, an office building in Baltimore City ("the Pratt Street Property" or "the Property").

In early 2005, Colliers Pinkard and CMC entered into a Brokerage Agreement for Colliers Pinkard to represent CMC's interests in the purchase of commercial property in the Baltimore City/Washington, D.C. area. Under the Brokerage Agreement, CMC paid Colliers Pinkard a monthly fee (at first, $2,500, and later, $5,000) to identify potential investment properties in the $20 million dollar and above price range. According to the involved principals of Colliers Pinkard and CMC, the Brokerage Agreement applied only

to potential investment properties for which Colliers Pinkard was not the listing agent.

The Brokerage Agreement provided that, in addition to the monthly retainer, CMC would pay Colliers Pinkard a commission on any sale to CMC that resulted from Colliers Pinkard's efforts. The agreement further provided that, for any given sale, if Colliers Pinkard were able to persuade the property seller to pay the commission in an amount equal to or greater than "the suggested CMC discounted fee," Colliers Pinkard would "not seek remuneration from CMC." In other words, if Colliers Pinkard could obtain its commission (or more) from the seller of commercial property to CMC, CMC would not be obligated to pay a commission to Colliers Pinkard.

By August 2005, the business relationship between Colliers Pinkard and CMC had not proven fruitful and the entities decided to bring it to an end. They agreed that the Brokerage Agreement would remain in effect until the end of 2005, during which time CMC would continue paying Colliers Pinkard the monthly fee; and then the Brokerage Agreement would expire. Indeed, that is what happened, and the Brokerage Agreement came to an end as of December 31, 2005.

In the meantime, Wilkens, through Stone, decided to put the Pratt Street Property up for sale. After a few months of marketing the Property on his own, without success, Stone approached Colliers Pinkard about serving as Wilkens's broker in the sale of the Property. Colliers Pinkard agreed and, on November 18, 2005, the entities entered into a Listing Agreement for the sale of the Property.

In early December 2005, representatives of CMC traveled to the United States to inspect potential commercial investment properties. On December 7, 2005, the CMC representatives met with Iglehart and Malone of Colliers Pinkard to view a number of properties in the Baltimore area. The Pratt Street Property was not one of them.

At one point during the visit, Colliers Pinkard representatives told the CMC representatives they might want to look

at the Pratt Street Property, even though it was priced below their target value for potential investment properties. The CMC representatives then visited the Property, but not in the company of anyone from Colliers Pinkard. Thereafter, the CMC representatives informed the Colliers Pinkard representatives, by e-mail, that they would be interested in receiving additional information about the Property.

The Pratt Street Property was to be sold by means of a "controlled auction," which is a common practice in commercial real estate sales. As Wilkens's broker under the Listing Agreement, Colliers Pinkard made the arrangements for the auction. It prepared an Executive Summary for the Property, from which potential buyers would learn basic relevant information. That summary was publicly distributed on December 15, 200[5].

If a potential buyer expressed interest in the Property, Colliers Pinkard would send it a confidentiality agreement to execute. It was Colliers Pinkard's practice that, upon receipt of a signed confidentiality agreement from a potential buyer, it would send the potential buyer an Offering Memorandum, which was a detailed disclosure about the Property.

Because the CMC representatives had expressed interest in the Pratt Street Property, Colliers Pinkard added CMC to the list of potential buyers for the Property and sent it a copy of the Executive Summary.

In early January 2006, after the Executive Summary had been mailed out to all potential buyers, Colliers Pinkard began contacting the various entities that had responded to the mailing to obtain signed confidentiality agreements before mailing the Offering Memorandum.

On January 18, 2006, CMC executed a confidentiality agreement, which Colliers Pinkard received. Soon thereafter, CMC was mailed the Offering Memorandum. CMC was one of 48 entities to receive the Offering Memorandum.

The first round of bids on the Pratt Street Property took place on February 3, 2006. CMC was one of five bidders, and its bid of $12.5 million was the second highest.

On February 6, 2006, Malone of Colliers Pinkard met with Stone of Wilkens to discuss the bids that had come in from each potential buyer. At that meeting, in response to an inquiry, Malone told Stone about the Brokerage Agreement between Colliers Pinkard and CMC. Specifically, Malone explained that Colliers Pinkard had contracted with CMC to help it locate potential investment properties to purchase, and that the contract had expired as of the end of 2005.

Stone memorialized that conversation in a note to himself, in which he also wrote that Wilkens should proceed with the second round of bidding, "get [the] CMC final proposal," and then inquire more about the business relationship between CMC and Colliers Pinkard. He further noted that if, at that time, he thought the prior contract between CMC and Colliers Pinkard posed a problem, he would have to decide whether to go forward with a sale to CMC or to go forward with a sale to another bidder; and if he thought there was no problem, he would "proceed."

The second round of bidding was held on February 23, 2006. The bids were submitted on invitation by Wilkens, through Colliers Pinkard, as its broker. Invitations were extended only to three entities, one of which was CMC. Stone's decision to include CMC as one of the second round bidders was made after the February 6, 2006 meeting.

As it turned out, one of the three invited bidders dropped out before the second bidding round, leaving only two entities (including CMC) to participate in that round. Both participants submitted increased bid amounts. CMC's bid, for $13,175,000, was the high bid, by $725,000.

In late February 2006, after the second round bids were received, Stone instructed Colliers Pinkard that, from that point on, he would handle the negotiations with CMC on his own. On March 1, 200[6], Stone met with representatives of CMC and tried to persuade them to increase their bid. They refused and the sales price remained $13,175,000.

Stone informed representatives of CMC that, before a sales contract would be executed, he wanted to see a copy of the Brokerage Agreement between Colliers Pinkard and CMC. He also asked CMC to pay Colliers Pinkard's commission. CMC refused to pay the commission, on the ground that Colliers Pinkard had not acted and was not acting as its broker in the transaction in question (i.e., the sale of the Pratt Street Property); to the contrary, Colliers Pinkard was acting as Wilkens's broker in that transaction.

CMC representatives confirmed for Stone that its Brokerage Agreement with Colliers Pinkard had expired on December 31, 2005. On April 27, 2006, CMC e-mailed Stone a copy of the expired Brokerage Agreement. The final contract of sale for the Property by Wilkens to CMC was executed the next day [April 28, 2006]. Stone had read the Brokerage Agreement before then.

On May 24, 2006, in anticipation of the settlement on the sale of the Pratt Street Property, Colliers Pinkard sent Wilkens an invoice for $226,321.67, its commission as calculated under the terms of the Listing Agreement. Closing took place on June 14, 2006. Thereafter, Wilkens failed to pay Colliers Pinkard's commission, notwithstanding demand.

189 Md.App. at 260–65, 984 A.2d at 332–34.

What the parties and the Court of Special Appeals refer to as the "Brokerage Agreement" between CMC and Respondent is an *"Acquisition Consulting Proposal"* that Respondent submitted to CMC, which was "Approved by" CMC on April 6, 2005. This agreement, which we shall also refer to as the Brokerage Agreement, was signed by Philip C. Iglehart and Dennis P. Malone on behalf of Respondent, and by Carl P. McCann on behalf of CMC.

Before the Brokerage Agreement expired on December 31, 2005, there were three communications between Respondent and CMC that pertained to 300 West Pratt Street. Mr. Iglehart testified that, on December 7, 2005, after taking CMC representatives through the World Trade Center, he and Mr.

Malone suggested that the CMC representatives "look at 201 North Charles Street[,] which we were going to be bringing to the market . . ., and 300 West Pratt Street which we were, in fact, somewhat reluctant about because they had made it pretty clear for a long period of time that their minimum threshold from an efficiency point of view, spending all the time and the money to coming into the United States, that their minimum valuation for a property was more than $20 million." In a December 13, 2005 e-mail to Respondent, CMC advised that it had "an active interest in pursuing Word Trade Center, Padonia Village, and 300 West Pratt Street." On December 15, 2005, Respondent mailed to CMC a copy of the Executive Summary for 300 West Pratt Street.

Every person who signed the Brokerage Agreement testified that it did not apply to properties for which Respondent was the listing agent. Mr. Iglehart testified as follows:

Q: And what kinds of services were you providing CMC under this arrangement?

A: The arrangement was very specifically stated that it would be two pronged effort. And the two pronged effort would be that we would approach owners of real estate who had not put their property into the market and ask them whether or not they would be interested in selling their real estate. If they were interested in selling real estate, we would take the next step with that group. That's the first prong. The second prong was to approach and introduce CMC to brokers other than Colliers Pinkard who were in the market, formally, representing an owner and selling a piece of real estate.

Q: During this period of time of 2004 and 2005, what, if any understanding existed with respect to the services that you would be rendering to CMC with respect to the property for which you, Colliers Pinkard, was the listing agent?

A: It was very clear. First off, the industry is absolutely clear as to when you've got an exclusive agent—agency and you're representing an owner, it's the fiduciary responsibility. It's the exclusive agency responsibility. You're an

advocate in every way, every sense of the word to that client. And it was made very clear to CMC multiple times over the relationship.

Mr. Malone testified as follows:

Q: And during 2004, and 2005, did you ever discuss with [CMC] properties on which Colliers Pinkard was the listing agent?

A: Yes.

Q: When you were doing so, discussing with [CMC] properties on which Colliers Pinkard was the listing agent, were you acting as the agent of [CMC], the seller, or both?

A: The seller

Q: And did you express that to [CMC's] representatives?

A: Yes.

Mr. Donnelly testified as follows:

Q: At the time [the brokerage agreement] was executed, did you know that Colliers Pinkard was acting as the listing [agent] for various sellers of commercial real estate?

A: Yes.

Q: And under this agreement, was Colliers Pinkard going to be acting as CMC's agent, with respect to the property that Colliers Pinkard was also the listing agent.

A: No, we were—we understood from the beginning that any property that Colliers had, that they were representing the seller.

Q: Under this agreement, was Colliers Pinkard going to be acting as CMC's agent when it was also acting as agent for the seller, with respect to a particular piece of property?

A: We always understood that if Colliers was selling the property, they were not representing us.

The jurors, who were entitled to believe all, part, or none of the above quoted testimony, returned their verdict on a "special verdict" sheet that contains the following questions and answers:

1. Do you find that Colliers Pinkard has proven by a preponderance of the evidence, that Wilkens Square and Stone & Associates breached their obligations under the Listing Agreement by failing to pay the commission due to Colliers Pinkard

Please Answer Yes or No: __YES__

2. Do you find, that Wilkens Square and Stone & Associates have proven by a preponderance of the evidence that Colliers Pinkard engaged in a dual agency by representing both Wilkens Square & Associates and Charles McCann Investments with respect to the sale of 300 West Pratt Street?

Please Answer Yes or No: __NO__

3. If you answered "Yes" to Question 2, do you find that Colliers Pinkard has proven by preponderance of the evidence that Wilkens Square and Stone & Associates had full knowledge of this dual agency or other material information and that the waived any breach of contract resulting from Colliers Pinkard failure to disclose?

Please Answer Yes or No: __[blank]__

4. If you answered "Yes" to Question 1 and either "No" to Question 2 or "Yes" to Question 3, what amount of damages, if any, do you award Colliers Pinkard?

$226,321.67

5. Do you find, that Wilkens Square and Stone & Associates have proven by a preponderance of the evidence that Colliers Pinkard breached its promises arising out of the listing agreement by failing to properly market 300 West Pratt Street or by failing to properly support its underwriting assumptions

Please Answer Yes or No: __NO__

*If you answered "NO" please skip the question below and go directly to Question No. 7*

6. If you answered "Yes" to Question 5, what amount of damages, if any, do you award Wilkens Square and Stone & Associates?

Please state a dollar amount $ [blank]

7. Do you find by a preponderance of the evidence that Colliers Pinkard breached the fiduciary duties that it owed to Wilkens Square and Stone & Associates?

Please Answer Yes or No: NO

8. If your answer to question 7 was "yes", what amount of damages, if any, do you award to Wilkens Square and Stone & Associates?

Please state a dollar amount $ [blank]

9. Do you find by a preponderance of the evidence that Colliers Pinkard entered into a conspiracy with Charles McCann investments?

Please Answer Yes or No: NO

10. If your answer to question 9 was "yes", what amount of damages, if any, did Wilkens Square and Stone & Associates suffer as a result of that conspiracy?

Please state a dollar amount $ [blank]

11. Do you find by clear and convincing evidence that Colliers Pinkard breached the fiduciary duties that it owed to Wilkens Square and Stone & Associates or entered into a conspiracy with Charles McCann Investments?

Please Answer Yes or No: NO

12. Do you find by clear and convincing evidence that Colliers Pinkard acted with actual malice?

Please Answer Yes or No: NO

In the Court of Special Appeals, Petitioners argued that (1) they had (in the words of their brief) "adduced such powerful evidence as to compel a finding, as a matter of law, that [Respondent] was in a dual agency relationship with [Petitioners] and with CMC from November 15, 2005, until December 31, 2005[;]" (2) Respondent's failure to disclose its relationship with CMC constituted a breach of its fiduciary duty to Petitioners; and (3) Petitioners were prejudiced by erroneous jury instructions and a verdict sheet that "improperly limited the issues to be decided" by the jury. As noted above, the Court

of Special Appeals affirmed the judgments of the Circuit Court.

## Discussion

## I. & II.

■ Petitioners continue to argue that the Circuit Court erred in denying their motion for judgment on "dual agency" grounds. It is well settled that (1) a trial court's denial of a motion for judgment is reviewed *de novo* by the appellate court, and (2) as it conducts its *de novo* review, the appellate court must view the evidence presented to the jury in a light most favorable to the party who prevailed at trial.

A "dual agent" is a "licensed real estate broker, licensed associate real estate broker, or licensed real estate salesperson who acts as an agent for both the seller and the buyer or the lessor and the lessee in the same real estate transaction." Md.Code Ann., Bus. Occ. & Prof. ("BOP"), § 17–530(a)(5) (2004 Repl.Vol., 2009 Supp.).[1] A "real estate broker" is an individual who provides "real estate brokerage services". § 17–101(n). To prevail in the case at bar, Petitioners were required to persuade the jury by a preponderance of the evidence that Respondent "provided real estate brokerage services" to both Petitioners and CMC "in the same real estate transaction," for "consideration." While holding that the Circuit Court correctly rejected Petitioners' argument that they were entitled to judgment as a matter of law, the Court of Special Appeals stated:

> Absent the knowing consent of the parties to a real estate transaction, the broker's fiduciary relationship with his client precludes a "dual agency," that is, the same broker representing both sides in the transaction.
>
> \*　　\*　　\*
>
> Accordingly, a broker in a dual agency that is not consented to by both principals cannot recover a commission

---

1. All statutory references are to the Business Occupations and Professions article unless otherwise stated.

from either party to the transaction, as any commission paid would amount to a benefit conferred on a fiduciary who violated his duty in the transaction. . . . There are no Maryland dual agency cases that extend the commission forfeiture rule to situations in which a real estate broker has represented two parties at the same time in different transactions or has represented two parties to a transaction at different periods of time.

\*    \*    \*

[T]he holding in *Ricker v. Abrams*, 263 Md. 509, 283 A.2d 583 (1971), makes plain that proof of dual agency must consist of evidence that the broker represented the opposite sides to a transaction when the transaction took place.

\*    \*    \*

The evidence in the case at bar was undisputed that Colliers Pinkard did not represent CMC in the sale of the Pratt Street Property, on June 14, 2006, and indeed did not represent CMC in any capacity after December 31, 2005. The evidence also was undisputed that Colliers Pinkard in fact represented Wilkens in the sale of the Pratt Street Property, and in the auction process that led to the sale of the Property to CMC. Under the holding in *Ricker*, and consistent with all of the Maryland dual agency cases, as a matter of law, Colliers Pinkard was not representing both sides to Pratt Street Property sale when the sale went forward or when the auction that resulted in the sale was held, and therefore was not in a dual agency respecting that transaction. When the auction and sale of the Pratt Street Property took place, Colliers Pinkard was representing one party to the transaction (Wilkens) and not the other (CMC). Under *Ricker*, there was not a dual agency when the sale took place, when the auction was held, or at any time after December 31, 2005, as a matter of law.

The sole evidence at trial that showed that Colliers Pinkard had any business relationship with CMC at the same time it had a business relationship with Wilkens was that, from mid-November, 2005, until December 31, 2005, Colliers

Pinkard had a contract (the Brokerage Agreement) with CMC to render general real estate purchase consulting services and also had a contract (the Listing Agreement) with Wilkens to market the Pratt Street Property for sale. The mere coexistence of the two contracts did not constitute a dual agency under Maryland law. . . . Here, there was no inherent conflict in Colliers Pinkard's contracts with the two entities. It could properly perform its obligations under both contracts without necessarily breaching a fiduciary duty to one client or the other.

The only evidence adduced at trial that linked the Colliers Pinkard contracts with CMC and with Wilkens to the Pratt Street Property was that, in mid-December 2005, Colliers Pinkard recommended to CMC that its representatives view the Property, and that, later that same month, in response to CMC's expressed interest in the Property, Colliers Pinkard, as broker for Wilkens, added CMC to the list of entities to receive the Executive Summary about the Property. Wilkens argues that, by recommending that CMC's representatives view the Pratt Street Property, even though it was not valued in the $20 million dollar range, Colliers Pinkard was rendering real estate brokerage services to CMC, for a fee, respecting the purchase of the Pratt Street Property, at the same time it was representing Wilkens with respect to the sale of the same Property. Specifically, Wilkens asserts that Colliers Pinkard, by serving as a consultant to CMC with respect to the purchase of the Property, was providing "real estate brokerage services" to CMC as that term is defined by Maryland Code (2004 Repl.Vol., 2009 Supp.), section 17–101($l$) of the Business Occupations and Professions Article ("BOP").

\* \* \*

Here, Colliers Pinkard's agreement to present properties to CMC was not in conflict with its fiduciary obligations to Wilkens under the Listing Agreement. The mere recommendation that CMC consider properties worth less than $20 million generally, and that it consider the Pratt Street property specifically, did nothing to further CMC's interest

in purchasing the property, nor could it possibly be construed as adverse to Wilkens's interest in selling the property.... Stated another way, Colliers Pinkard never acted as CMC's agent with respect to the sale of the Pratt Street Property, and thus could not have been a dual agent for the purpose of that transaction. In fact, the most logical inference to be drawn from the evidence presented is that Colliers Pinkard, in recommending that CMC look at the Property, was acting in its capacity as listing agent for the Property, and thus seeking to advance the interests of Wilkens. At the very least, we cannot say that this evidence was sufficient to require a finding of dual agency as a matter of law.

189 Md.App. at 269–76, 984 A.2d at 336–41. We agree with and adopt that analysis.

In the case at bar, the "transaction for which the commission is being sought" involved (1) a "first round" bid made by CMC on February 3, 2006, (2) a "second round" bid made by CMC on February 23, 2006, and (3) a contract of sale that was executed on April 28, 2006. The "transaction took place" on June 14, 2006. Prior to CMC's "second round" bid, (1) Petitioners had been provided with a brochure that disclosed the relationship between Respondent and CMC, (2) Mr. Malone had told Mr. Stone that Respondent had contracted with CMC to help CMC locate potential investment properties to purchase, and that this contract had expired at the end of 2005, and (3) upon being told about the Brokerage Contract between Respondent and CMC, Mr. Stone decided to proceed with the second round of bidding, "get [the] CMC final proposal," and then inquire more about the business relationship between CMC and Respondent. After meeting with Mr. Malone on February 6, 2006, Mr. Stone noted that, if the prior contract between CMC and Respondent posed a problem, he would have to decide whether to go forward with a sale to CMC or to go forward with a sale to another bidder; and if he thought there was no problem, he would "proceed." Under these circumstances, the Circuit Court would have committed error if it had granted Petitioners' motions for judgment.

■ Petitioners argue, however, that the "dual agency commission forfeiture" rule is applicable to the case at bar because the Brokerage Agreement between CMC and Respondent had not yet expired when Respondent recommended that CMC's representatives view the property. The agreement between Respondent and CMC, in pertinent part, provided:

2) Fee Schedule to be paid by CMC if property is sourced through a broker representing an owner.

$30–40 million [ ]

$40–50 million [ ]

\* \* \*

3) Fee Schedule to be paid by CMC if property is purchased directly from owners and owner won't pay the fee. These facts represent an approximate 20% discount to market fees associated with the various transaction sizes listed.

$30–40 million [ ]

$40–50 million [ ]

\* \* \*

4) If fee is able to secured from owner and said fee is equal to or greater than suggested CMC discounted fee, Colliers Pinkard will not seek remuneration from CMC. If fee is paid by the owner, but is less than the suggested CMC discounted fee, Colliers Pinkard would expect CMC to make up the difference.

Petitioners argue (in the words of their brief)

[T]he third scenario . . . is fundamentally inconsistent with, and gives lie to, Colliers Pinkard's claim that the agreement with CMC did not apply in situations where Colliers Pinkard represented the seller.

\* \* \*

For this contingency to apply, Colliers Pinkard must be representing the seller—else why is it collecting a commission from it? The seller would not be obligated to pay Colliers Pinkard for acting as CMC's broker. A seller would pay Colliers Pinkard only if Colliers Pinkard was the

seller's agent. If so, Colliers Pinkard could not simultaneously act for and accept a compensation for brokerage services to CMC, at least not without disclosure to both of its principals. Yet the third scenario plainly provides for payment to Colliers Pinkard from both parties to the transaction[.]

The only reasonable interpretation—indeed, the only conceivable one—is that Colliers Pinkard intended its agreement with CMC to apply to every property it presented to CMC that was ultimately purchased by CMC, and it drafted the third "scenario" with that in mind. The claim that the Agreement did not apply to properties in which Colliers Pinkard represented the seller was patently a cover story cooked up when Colliers Pinkard got caught with its "hand in the cookie jar."

The Court of Special Appeals rejected this argument. So do we.

In *Ocean Petroleum Co. v. Yanek,* 416 Md. 74, 5 A.3d 683 (2010), this Court stated:

We employ in Maryland an objective approach to contract interpretation, according to which, unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation. *Cochran v. Norkunas,* 398 Md. 1, 16, 919 A.2d 700, 709 (2007). This undertaking requires us to restrict our inquiry to "the four corners of the agreement," *id.* at 17, 919 A.2d at 710, and ascribe to the contract's language its "customary, ordinary, and accepted meaning." *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194, 199 (2001) (internal quotation marks and citation omitted).

Rather than acquiescing to the parties' subjective intent, we consider the contract from the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation. *Cochran,* 398 Md. at 17, 919 A.2d at 710. Thus, " 'the true test of what is meant is not what the parties to the contract intended it to mean, but what a

reasonable person in the position of the parties would have thought it meant.'" *Id.*, 919 A.2d at 710 (quoting *General Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985)). The language of a contract is only ambiguous if, when viewed from this reasonable person perspective, that language is susceptible to more than one meaning. *United Servs. Auto. Assoc. v. Riley*, 393 Md. 55, 80, 899 A.2d 819, 833 (2006).

*Id.* at 86–87, 5 A.3d at 690–91.

■ "If the language [of a contract] is ambiguous, extrinsic evidence may be consulted." *Collier v. MD–Individual Practice Association, Inc.*, 327 Md. 1, 6, 607 A.2d 537, 539 (1992). Although it is true that the Brokerage Agreement does not expressly state that it is inapplicable to (1) properties valued at less than $20,000,000, and/or (2) transactions in which Respondent is representing the seller, such an interpretation is entirely consistent with (1) the above quoted fee schedule set forth therein, as well as (2) the testimony of Mr. Iglehart, Mr. Malone, and Mr. Donnelly, which the jury was entitled to accept as true.[2]  Under these circumstances, we hold that the evidence presented at trial was—at the very least—sufficient to generate a question of fact on the issue of whether the Brokerage Agreement was applicable to Petitioners' sale of 300 West Pratt Street.

### III.

■ Petitioners also argue that they were entitled to judgment as a matter of law on their breach of fiduciary duty

---

**2.** If the trier of fact accepts as true the testimony of both the buyer and the broker that the broker did not act on behalf of the buyer, dual agency did not exist as a matter of law. *Ricker v. Abrams*, 263 Md. 509, 515, 283 A.2d 583 (1971) (finding no dual agency where the uncontradicted testimony of the broker and the buyer was that the broker had not acted on behalf of the buyer with respect to a particular sale even though the buyer was otherwise a client of the broker); *Stokes v. Wolf*, 137 Md. 393, 412–413, 112 A. 566, 573 (1921) (finding "not the slightest evidence that [the broker] was to receive or did receive any compensation or reward for the purchase of the property").

claim, which is based upon the theory that Respondent was obligated to disclose to them the fact that Respondent had entered into a Brokerage Agreement with CMC. A real estate broker has a duty to disclose to his or her principal *all facts or information* which may be relevant or material in influencing the judgment or action of the principal in the matter. *St. Paul at Chase Corp. v. The Manufacturers Life Ins. Co.*, 262 Md. 192, 215–216, 278 A.2d, 12 (1971) (*quoting Coppage v. Howard, supra*, 127 Md. at 523, 96 A. at 646). Citing *Sellner v. Moore*, 251 Md. 391, 247 A.2d 523 (1968), the Court of Special Appeals stated that, "depending upon the facts and circumstances in a given case, there may be information in addition to or other than dual agency that is material to the principal, and therefore must be disclosed to the buyer. Failure to disclose such information may likewise result in a forfeiture of a broker's commission." 189 Md.App. at 278, 984 A.2d at 342.

On the issue of whether Petitioners had concealed material information, the Court of Special Appeals stated:

Wilkens's insistence that it wished to know about the CMC–Colliers Pinkard relationship is not alone sufficient to render that information material. Rather, as Wilkens itself argues, we must consider what a reasonable person in the principal's position would wish to know under the facts and circumstances of the transaction in question. There was no objective evidence in this case that Colliers Pinkard's contract with CMC to assist it in purchasing properties in the Baltimore City/Washington D.C. area would have been material to Wilkens with respect to the ultimate sale of its property.

\*    \*    \*

In arguing that the CMC–Colliers Pinkard relationship was material information that could have affected its actions, Wilkens points to the testimony by Iglehart, on cross-examination, that, if sellers (in general) knew of Colliers Pinkard's buyer's-broker relationship with CMC, it would have made it more difficult for Colliers Pinkard to represent

sellers. Iglehart's general testimony, however, does not establish that knowledge of the CMC–Colliers Pinkard relationship was material or relevant to Wilkens's actions with respect to the transaction at issue.

\* \* \*

The only other specific argument advanced by Wilkens on why the relationship between Colliers Pinkard and CMC was material is that, had it known of the relationship, it could have negotiated a better deal with CMC regarding payment of Colliers Pinkard's commission. Wilkens, however, produced no evidence that the Brokerage Agreement obligated CMC to pay Colliers Pinkard a commission for its purchase of the Property, and regardless, the existence of such evidence simply would have gone to the ultimate question put before the jury of whether there was a prohibited dual agency.

To be sure, if Colliers Pinkard was in a dual agency with CMC and Wilkens respecting the Pratt Street Property, there would have been a fiduciary duty to disclose that fact. For the reasons we have discussed above, it is questionable whether there was any legally sufficient evidence of dual agency in this case; and if there was any at all, the jury decided as a matter of fact that a dual agency did not exist. There simply was no evidence of any other "material fact," *i.e.*, a fact that reasonably would have had an impact one way or the other upon Wilkens's decision to sell the Property to CMC, that Colliers Pinkard had a duty to disclose, but did not. Accordingly, the court did not err by refusing to enter judgment for Wilkens on that basis.

189 Md.App. at 280–281, 984 A.2d at 343–344. We agree with and adopt that analysis.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONERS TO PAY THE COSTS.**