540 A.2d 133

**John P. PROCTOR, et al.**

v.

**Michael HOLDEN, et ux.**

No. 1206, Sept. Term, 1987.

Court of Special Appeals of Maryland.

April 14, 1988.

Certiorari Denied Aug. 29, 1988.

2

David R. Thompson (Earnest & Cowdrey, P.A., on the brief), Easton, for appellants John and Deborah Proctor.

Waller S. Hairston (James M. Slay, Jr. and Henry, Hairston & Price, on the brief), Easton, for appellant Freeman & Kagan, Inc.

George J. Goldsborough, Jr. and Michael J. Kopen (Goldsborough & Tolley, on the brief), Easton, for appellees.

**4**

Argued before WILNER, GARRITY and ALPERT, JJ.

ALPERT, Judge.

This is an appeal by John P. and Deborah Proctor, and Freeman & Kagan, Inc. from a jury verdict entered in favor of Michael and Deborah Holden in the Circuit Court for Talbot County. Count I of appellees' Complaint alleged breach of contract by the Proctors for their failure to return the $20,000 deposit despite appellees' inability to obtain the financing provided for in the contract. Count II of the Complaint alleged a breach of a fiduciary duty by Freeman & Kagan by: (1) failing to disclose all pertinent information to the Holdens, (2) drafting and inserting an ambiguous and contradictory financing clause in the contract, and (3) improperly urging the Holdens to increase their purchase offer by $7,000, the amount of the realtor's commission.

Upon jury verdicts in favor of the Holdens, judgments were entered for the release and return of the $20,000 escrow against the Proctors, and for $1.00 in compensatory damages and $10,000 in punitive damages against Freeman & Kagan. Both defendants appealed.

## FACTS

The material facts, which are not in dispute, follow. In April 1985, appellees Michael and Deborah Holden decided to relocate from Ocean City, Maryland to the Mid–Shore area in order to be closer to their families in Baltimore and Annapolis. The Holdens contacted Charlotte Valliant, a real estate agent associated with appellant Freeman & Kagan, Inc., a real estate brokerage in Easton. For more than a month, Valliant showed the Holdens homes in the Talbot County area, some listed with Freeman & Kagan and some listed with other brokers. Also, on a weekly basis Valliant sent appellees a list of new properties, as well as information about properties which had not yet been listed,

but of which she had knowledge. During this period, Valliant was actively seeking a home for appellees.

On May 24, 1985, Valliant showed Michael Holden a home located on Edgeview Road, near Royal Oak, which the then owner, Howard Gillellan, had just listed with Freeman & Kagan at a price of $169,500. Upon Valliant's urging that the house was a "tremendous buy" and that it was "grossly under-priced," Michael Holden submitted a contract offer in the amount of $170,000 cash, the only contingency being that Deborah Holden be allowed to inspect the property prior to noon the next day. Because the Holdens could not make the trip to Freeman & Kagan's office that day to sign a contract, their offer was submitted by telegram, the text of which was dictated by Tim Kagan.

In exhorting appellees to submit an offer, Valliant related to the Holdens that there was strong interest in the Gillellan property, and that any delay could mean the loss of the property. In fact, Mr. Holden was told that another full-price contract had been submitted by another client of Freeman & Kagan. In a phone conversation with Kagan and Valliant, Michael Holden specifically requested that either Valliant or Kagan personally sponsor, present, and urge their offer upon Mr. Gillellan, the owner. Nevertheless, only the listing agent, Marshall Bailey, presented both contracts. Gillellan accepted the other contract submitted by appellant Deborah Proctor. According to Bailey, Gillellan accepted the Proctor contract, at least in part because of his fear of losing both offers if he waited for Mrs. Holden's inspection and approval of the home. The Proctor contract was for $169,500 and was subject to a financing contingency.

Although apparently losing the Gillellan home, appellees remained in contact with Charlotte Valliant during the months of June and July, 1985. On July 14, 1985, Valliant called and informed the Holdens that they could buy the Gillellan property from the Proctors for $203,000. Almost immediately Michael Holden contacted Delphine Amrhun, Office Manager at Magnet Mortgages, a mortgage compa-

ny located in Ocean City, about obtaining a $150,000, 30–year term loan for the property.

On July 24, 1985, the Proctors signed a 24–hour listing agreement with Freeman & Kagan. Later that same day Michael and Deborah Holden visited the property where they met and spoke directly with Deborah Proctor for the first time. Asked about the possibility of owner-financing, Deborah Proctor responded that she would not hold any financing, and in addition she wanted settlement within 30 days. Michael Holden responded that even though he had already submitted a mortgage application to Magnet Mortgages 60 days was needed; after some discussion Proctor agreed.

Thereafter, at the Freeman & Kagan office, Valliant prepared for the Holdens' signature a standard fill-in-the-blanks contract then in use by the Talbot County Board of Realtors. $210,000 was inserted in the blank for purchase price[1]. In addition, a mortgage contingency clause was completed, which is set out in full *infra*. The contract also stated: "Time is of the essence of this agreement." The Holdens tendered a $20,000 deposit with their contract, to be held in an interest bearing account by the broker, Freeman & Kagan.

The Proctors accepted the contract on July 26, 1985. On approximately August 1, 1985, Delphine Amrhun of Magnet Mortgages telephoned Michael Holden to advise him that he would not qualify for a $150,000 30–year loan; moreover, she intimated that no lender employing standard FNMA/FHLMC guidelines would qualify him for such a loan because of his high debt to earnings ratio. Amrhun later confirmed this in a letter to Holden dated August 8, 1985. Holden then submitted a mortgage application to Second National Building & Loan on August 9th, which similarly was rejected on August 12th.

---

**1.** The asking price was raised by the Proctors from $203,000 to $210,000, apparently to cover Freeman & Kagan's $7,000 commission.

Michael Holden also approached the Talbot Bank for a loan. Mr. Jeffrey Hefflebower, a senior vice president of the bank, testified, however, that Talbot did not offer long-term fixed rate mortgages. It was Hefflebower's understanding that Holden was seeking a short-term loan that would be paid off from the proceeds of the sale of a business. Hefflebower also stated that although the property was appraised and the application was ready for the Committee's decision, the bank took no final action and neither accepted nor rejected Holden's application. Holden testified that he assumed the bank's silence meant the loan was rejected.

At the request of the realtors, Mr. Talbot Roe of United Mortgage contacted Holden. Mr. Roe stated that he could help the Holdens obtain a loan through a group of investors "who didn't care what the risk was." Holden testified that he was not interested in Roe's offer on the basis of his being told by two reputable banks that he could not afford the loan.

Holden notified Charlotte Valliant by letter of his inability to obtain financing and requested the return of his $20,000 deposit. In response, Tim Kagan of Freeman & Kagan, in a letter dated August 20, 1985, informed the Holdens that the Proctors had agreed to finance the purchase pursuant to the adjustable rate terms stated in the contract. Specifically, in a letter addressed to Mr. Kagan, the Proctors expressed their willingness to finance the Holdens' purchase with a $150,000 mortgage at an initial 10% interest rate, the interest rate to be adjusted annually by no more than 2% up or down and a 4% lifetime cap. Three points were to be paid the Proctors by the Holdens. The Proctors also requested that the Holdens forward a financial statement and credit references. The Holdens rejected this offer of owner financing and again requested a refund of their deposit. The Proctors refused. Accordingly, Freeman & Kagan did not release the funds, and the Holdens filed suit against the Proctors to compel release of

their deposit, and against Freeman & Kagan for breach of fiduciary duty.

Both defendants have appealed the jury's verdict against them and we address each argument in turn.

## I. PROCTOR v. HOLDEN

The Proctors present the following questions:

1. Did the court err in declining to decide the legal issues submitted upon cross motions for summary judgment?

2. Did the court abuse its discretion in declining to decide questions of law relating to the construction of the contract?

3. Did the court err in submitting the case to the jury with instructions that the construction of the contract was for the jury?

4. Did the court err in permitting extrinsic evidence to go to the jury, when the contract was unambiguous on its face?

5. Did the court err in permitting testimony concerning the re-sale of the property which was the subject of the contract?

6. Did the court err in failing to instruct the jury as requested by the Proctors?

### A. Questions 1-4

■ We note that although appellants list six questions, they do not address each one. Instead only one "argument" is presented in the brief. We, too, shall not address each question individually because, upon analysis, we conclude that six issues are not raised.

Questions one through four are premised on an affirmative answer to the question: Did the court err in concluding the Proctor–Holden contract contained an ambiguous financing clause and consequently permitting the jury to consider the Holdens' efforts to procure financing? Be-

cause we answer this question in the negative, questions one through four must be resolved adversely to appellant.

The essence of appellants' argument is that the Holdens forfeited their right to the return of their deposit by not fulfilling their obligation under the financing clause. Specifically, appellants assert that appellees breached the contract (1) by not applying for a mortgage within five days of acceptance of the contract, and (2) by rejecting the Proctors' offer of owner financing. We disagree with both assertions.

The specific contract language underlying this dispute is paragraph 7, the "Financing Contingency," which reads:

**FINANCING CONTINGENCY**—This contract is contingent upon the Buyer obtaining a Purchase Money Loan as follows:

Amount borrowed at least *$150,000.00*. Interest rate not greater than *11%*. Period of amortization *30* years. Payments made on a *monthly* basis. Payoff of mortgage in *30* years. Required mortgage points paid by *buyer*. Adjustable rate mortgage starting at *10%* interest with a *4%* life cap. Buyer agrees to apply for said mortgage within five days of acceptance and to pay the normal closing costs in obtaining same. Buyer to receive mortgage committment and approval on or before *Sept. 7, 1985*. Should Buyer be unable to obtain said mortgage and Buyer so notifies the Seller or his agent on said date this contract will be null and void of no force or effect, all deposits returned and all parties to this contract released of all liability hereunder.

Thus, the clause provides for both a fixed rate conventional mortgage and an adjustable rate mortgage. Appellants argue that the clause should be read in the disjunctive despite the omission of language to that effect. We see no error in the trial judge's determination that the financing contingency is ambiguous inasmuch as the terms are obviously inconsistent. Clearly the Holdens were not agreeing to obtain a mortgage with both a fixed rate and an adjusta-

ble rate. If read in the disjunctive, the terms of the mortgage are unclear: Does the language "Period of amortization *30* years. Payments made on a *monthly* basis. Payoff of mortgage in *30* years. Required mortgage points paid by *buyer* " sandwiched between the two types of mortgages apply to both, or only to the fixed rate mortgage? The court did not err in admitting extrinsic evidence to determine the parties' intent. *See Admiral Builders Savings & Loan Ass'n v. South River Landing, Inc.*, 66 Md.App. 124, 502 A.2d 1096 (1986). Thus, the next step, to determine whether the Holdens took bona fide, prompt and reasonable actions to procure financing, was a question properly presented to the jury.

(1) Five Day Requirement

■ Next, appellant alleges that the "time is of the essence clause" superimposed upon the financing contingency compelled performance in the five day period following the contract's acceptance. According to appellants, the Holdens' mortgage application with Magnet Mortgages, originating before the Proctors accepted the contract, does not comply with the five-day requirement in the financing contingency. We disagree.

We have found no case precisely on point, but *Allview Acres v. Howard Investment Corp.,* 229 Md. 238, 182 A.2d 793 (1962) is instructive. In *Allview Acres* the sale of a 104 acre parcel of land was contingent upon the seller's obtention of a zoning reclassification. The issue before the Court of Appeals was whether the seller's application to the zoning board forty-two days *before* the contract was signed constituted compliance with the contract. Finding compliance, the court reasoned:

We have found no case dealing with the question whether efforts, reasonable in themselves, were or were not a compliance with the contract when (absent any specific time stipulations in the contract) they were initiated before the contract was signed and were continued thereafter. In the circumstances of this case, we have no

difficulty in concluding that the efforts were reasonable and did constitute a compliance with the contract.... Although the record does not show whether Manning, the original contract purchaser ... knew that an application had previously been filed at the time he signed the contract, the time set for settlement and common business practice strongly suggest that the purchaser was aware that the application had been initiated and that the settlement date was set with that in mind. Moreover, the absence of a date specified before or after which an application was required to be made, persuasively suggests that the fact that the application was initiated prior to the date of the contract was to have no legal consequence in the transaction.

. . . . .

Where, as here, the application was pending and had not been decided, it seems reasonably clear to us that such application was deemed to satisfy the requirement of the clause of the contract here in question. No possible advantage to either party and no greater prospect of success has been suggested—nor can we envision any— which might have been derived from filing the application after, instead of before, the execution of the contract.

*Id.* at 244–45, 182 A.2d 793.

The contingency at bar does contain a time limitation: "within five days of acceptance." The contract sets only an outside limit of five days for the buyer to make application. We do not construe this to mean that the application may not be initiated prior to acceptance of the contract. The purpose of the time limitation is to prevent a delay that jeopardizes the agreement. A buyer who delays in applying for a mortgage puts the settlement at risk. Setting an outside limit on the time for making a mortgage application protects the seller who is taking his house off the market. It also gives both parties peace of mind that the buyer is qualified and that settlement will take place on the stated date. *See* W.B. Raushenbush, *Problems and Practices With Financing Conditions in Real Estate Purchase Con-*

*tracts*, 1963 Wis.L.Rev. 566, 577. In the absence of specific language to the contrary, we cannot justify penalizing a buyer who acts responsibly by initiating the financing process in anticipation of making an offer to purchase property. *Cf. Bushmiller v. Schiller*, 35 Md.App. 1, 368 A.2d 1044 (1977) (contract purchaser's cancellation of mortgage application filed one day before the contract's acceptance and failure to apply elsewhere evidenced a lack of good faith efforts to obtain a mortgage). Indeed, Holden approached Magnet Mortgages three days after being told the Proctors had decided to sell. He testified, "... I initiated an application for a $150,000 loan. And my intention was to try to speed up the loan process in the event that we came to some kind of a deal on the house."

Moreover, the record indicates that Holden told Mrs. Proctor that he had applied for a loan at the time the two were negotiating a settlement date. Paraphrasing the *Allview Acres* court, *supra*, we perceive no possible advantage to either party, and no greater chance of success had the Holdens filed their application after, instead of before, the execution of the contract. Indeed, after learning that their application had been rejected, the Holdens applied to Second National Building & Loan and were again rejected because of their debt/income ratio. Inasmuch as most banks follow the same guidelines, it was Holden's "understanding ... that [he and his wife] would not qualify for any mortgage with any of those banks." The Holdens also followed up a lead from Ms. Valliant and contacted Miss Heath at Eastern Shore Mortgage. She too stated her bank would not approve the loan.

Appellants' reliance on *Traylor v. Grafton*, 273 Md. 649, 332 A.2d 651 (1975) is misplaced. In that case the Traylors merely "inquired" at one bank about financing. There was no evidence that they ever applied for a mortgage and that their application was rejected. Nevertheless, the Traylors reassured the sellers that there was "no problem about financing." Apparently, they were relying on an undisclosed principal to arrange financing. The Traylors failed

to appear for settlement and the sellers invoked the liquidated damages clause of the contract. Upholding the trial court's refusal to give a jury instruction invoking the contract's financing contingency, the Court of Appeals stated that the Traylors had failed to show that "they had taken bona fide, reasonable and prompt action to obtain the financing specified and had failed in their efforts." *Id.* at 689, 332 A.2d 651.

In contrast, in the case at bar evidence was adduced in support of the Holdens' position that they did take "bona fide, reasonable and prompt action" to secure financing. Whether the Holdens complied with their contractual obligation to apply for a mortgage raised a jury question. The court did not err. *See Stevens v. Cliffs at Princeville Assoc.*, 67 Hawaii 236, 684 P.2d 965, 971 (Hawaii 1984) (contract purchasers "are not obligated as a matter of law, to secure additional [lenders] in the event their bona fide loan applications are rejected for lack of sufficient income."); *Saltzman v. McCombs*, 71 Nev. 93, 281 P.2d 394 (Nev.1955) (buyers not in breach for failing to make formal written application when loan officer stated they would not qualify).

(2) Sellers' Offer to Finance

■ On August 12th the Holdens sent Ms. Valliant a copy of their rejection letter from Magnet Mortgages. On the 13th, they did the same with their rejection from Second National and requested the return of their deposit. Thereafter, in a letter from Tim Kagan dated August 20th, the Holdens were informed that the Proctors were willing to finance the purchase. Kagan forwarded the Proctors' letter offering a $150,000 loan subject to the following terms:

[W]e will provide a thirty (30) year (monthly payment of principal, interest, taxes and insurance) adjustable rate mortgage with an initial interest rate of 10%. The interest rate will be adjusted annually; any increase or decrease in the annual rate will not exceed two (2) percentage points. The rate will never be greater or less than

four (4) percentage points above or below the initial (10%) rate. Three (3) points will be paid by purchasers at the time of settlement; and, the adjustable rate note will specify that it may not be assumed. Except as set forth in this paragraph, the adjustable rate note will follow the format and contain the conditions in Loyola Federal Savings and Loan Association's standard adjustable rate note.

The Holdens rejected this offer and the appellants now argue that this rejection breached the financing contingency. Appellants cite no law to support their contention that the appellees were required, as a matter of law, to accept owner financing. Instead, appellants argue again only that the contract was unambiguous and, therefore, the court erred in admitting appellees' evidence that the parties did not contemplate owner financing at the time of contract.[2] Inasmuch as we have already held that the financing clause was ambiguous, this argument has no merit.

The evidence supports the Holdens. Prior to submitting their contract, Mr. Holden asked Mrs. Proctor if she would hold the mortgage. Mrs. Proctor refused. Furthermore, in Interrogatory No. 12 Mrs. Proctor was asked:

State when you first decided to offer owner financing to the [appellees].

She responded:

Approximately Thursday, Friday or Saturday, August 15, 16 or 17, 1985.

---

2. A home purchaser may prefer an institutional loan over owner financing for several reasons. Among the more commonly stated reasons are:

(1) A buyer may want to buy only if the judgment of a particular lender as to the property's value concurs with his own; (2) A buyer may want to borrow only from a lender whose practices in the event of default are known to be patient and reasonable; and (3) Lender's practices in permitting rapid pre-payment of loans vary widely, and a buyer might want to borrow only from a lender he knew would not seek to penalize pre-payment.

Raushenbush, *supra*, at 576; *Kovarik v. Veseley*, 3 Wis.2d 573, 89 N.W.2d 279, 285–86 (1958) (Fairchild, J., dissenting).

While there is no mention of owner financing in the contract, that fact alone is not decisive. There may be cases where owner financing, while not mentioned in the contract, may have been contemplated and indeed may be required. Under the facts of this case, we agree with the appellees that appellants were attempting "to force on him financing of the type that he did not desire or originally contemplate." *Tieri v. Orbell,* 192 Pa.Super. 612, 162 A.2d 248, 250 (1960). *See also Lach v. Cahill,* 138 Conn. 418, 85 A.2d 481 (1951). *But cf. Kovarik v. Veseley,* 3 Wis.2d 573, 89 N.W.2d 279 (1958) (source of loan was not material part of financing clause and buyer must accept seller's offer). We hold that the jury could reasonably conclude the appellees fulfilled their obligation under the financing clause by making reasonable efforts to secure a $150,000 fixed rate mortgage through an institutional lender.[3]

## B. *Resale of the Home*

■ The Proctors object to the court's admission of testimony concerning their resale of the home for $275,000. They argue that this evidence was irrelevant and prejudicial. Our review of the record, however, indicates that, assuming irrelevancy, the error was harmless particularly in light of the trial judge's instructions. In pertinent part, he instructed the jury:

A party for whose benefit the condition is made will be released from his obligations under the contract if that party has taken bona fide reasonable and prompt action to obtain the financing specified and has failed in his efforts.

. . . . .

You should return a verdict for the plaintiff, Michael Holden against the defendant, John B. Proctor and Deborah Proctor, if you find the following: that plaintiff took

---

**3.** We also note that the Proctor financing absolutely required the payment of "[t]hree (3) points ... by the purchasers at the time of settlement" whereas the Holdens may not have been required to pay any points upon obtaining an adjustable rate mortgage. See the "Financing Contingency" and our discussion thereof in part 1A *supra.*

bona fide reasonable and prompt action to obtain the financing specified in the parties' contract, and as provided by the terms of the contract, but were unable to obtain such financing.

If you do not so find, you should return a verdict for the defendants, John B. Proctor and Deborah Proctor.

. . . . . .

The claim against Mr. and Mrs. Proctor is based on the real estate contract accepted on July 27th, Plaintiff's Exhibit No. 1. There are two provisions of that contract which are involved in this case.

One of those provisions of the contract entitled default states that, deposit monies paid by the buyer will be forfeited to the seller, if the buyer defaults on his obligation under the contract. That is a valid provision of the contract.

And, if you find that the buyer, the Holdens in this case, did not perform their obligations under the contract, then they are not entitled to recover that deposit, and your verdict shall be for the Proctors on count one.

A party to a contract like the Proctors is entitled to receive the benefits of his or her bargain. And in this case the Holdens agreed to forfeit their deposit, if they did not perform their obligation under the contract.

The question for you to decide is whether the Holdens performed their obligations under the other contract clause involved in this case, the financing contingency clause.

. . . . .

If you find that the Holdens failed to apply for the financing as timely specified in the contract, or if you find that they were not acting in good faith, that is, that they were not seeking financing within the period required by the contract, with the honest intention of going thru with the contract, then your verdict should be for Mr. and Mrs. Proctor.

Thus, it is clear that the trial judge had the jury focus upon the Holdens' performance of the "financing contingen-

cy." In effect, the trial judge was telling the jury that the subsequent sale price had no bearing on the Holdens' performance of the "financing contingency."

### C. *Jury Instructions*

■ Finally, appellants state that the court erred in not giving their requested jury instructions numbered 12, 13, and 15. Maryland Rule 2–520 provides:

**Rule 2–520 INSTRUCTIONS TO THE JURY**

(c) **How given.**—The court may instruct the jury, orally or in writing or both, by granting requested instructions, by giving instructions of its own, or by combining any of these methods. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.

Our review of the record indicates the court's instructions more than "fairly covered" the matter covered in appellants' requested instructions numbers 12 and 13. Requested instruction number 15 entitled "excuse for non-performance [under a contract]" was properly omitted as it was not pertinent. The question of the Holdens' performance under the financing clause was adequately covered by other instructions.

### II. HOLDEN v. FREEMAN & KAGAN

The real estate broker is an agent for his principal, with a fiduciary's duties of diligence, care, loyalty, disclosure, and the like. That the broker is thus subject to the normal requirements of agency law is clear.... One may doubt the realism or good sense of applying traditional agency law to real estate brokerage. The broker's social and economic purpose is as an intermediary, bringing seller and buyer together and perhaps making both give a little bit in the process, for their own good. He has a sense of obligation to both, if he is conscientious, yet he really is a self-dealer, seeking monetary reward for fulfilling his useful social and economic role.

Raushenbush, *supra,* at 594. This case highlights the broker's ambivalent role: acting as a fiduciary of his princi-

pal, the seller, while also seeking "to protect the buyer." *Id.*

Appellees, the Holdens, remonstrate:

There is an insidious fiction that seems to pervade the real estate business which produces a silent boycott of the rights and interests of the very people upon whom the realtors' livelihood depends. Real estate agents and brokers seem to believe that an agency, or fiduciary, relationship depends upon, and attaches to the party who pays their fee; and by a realtor's perception that [that] person is always the seller. Yet when an unsuspecting client [4] comes to a realtor seeking advice and counsel on buying a house, he receives no caution, or warning, or alert that he should take anything said with a grain of salt; that no duty or allegiance is owed to him whatsoever; and that the realtor's sole allegiance is going to be given to the seller.

 It is well settled that a real estate broker's liability is founded on the law of agency. The Court of Appeals stated:

During the term of the agency, a real estate broker cannot act for both vendor and vendee in respect of the same transaction because of possible conflict between his interest and his duty in such case, and he must disclose to his principal all facts or information which may be relevant or material in influencing the judgment of the principal in the matter.

*Hardy v. Davis*, 223 Md. 229, 232, 164 A.2d 281 (1960) (quoting *Coppage v. Howard*, 127 Md. 512, 523, 96 A. 642 (1915); *Restatement (Second) Agency* § 381).[5] An expert

---

**4.** We note that although appellees' statement may have merit in some cases, the appellees at bar are not "unsuspecting clients." Michael Holden is a licensed real estate agent and taught real estate courses during 1981–83. He testified that he was personally involved as a buyer or seller in 14 real estate transactions.

**5.** *Compare Martin v. Hieken*, 340 S.W.2d 161, 165 (Mo.Ct.App.1960):

witness called by appellants testified that the seller is always the broker's client because he is paying the broker's commission. Typically, by listing his property for sale with a broker, the seller appoints the broker as his agent. The broker is thereby put in a fiduciary relationship with the seller, requiring a high degree of loyalty and good faith. The broker owes no fiduciary duty to the purchaser whose interests are adverse to the seller's.[6] Rohan, Goldstein, Bobis, *Real Estate Brokerage Law & Practice* § 3.07 (1987).[7]

■ Relying on the foregoing principles, appellants argue, *inter alia*, that the court erred in submitting the issue of breach of fiduciary duty to the jury. Appellants point to the fact that the Holdens never agreed to pay Charlotte Valliant, their purported "agent," or Freeman & Kagan, a commission or fee. Therefore, according to both agency principles and the definition of a "Real estate broker," Md.Ann.Code art. 56, § 212 (1987 Supp.), as a matter of law appellants owed no fiduciary duty to the Holdens.

The appellees respond that because they reposed trust and confidence in appellants, a "confidential relationship" existed between the parties, which confidence was breached

---

A broker so unwise as to place himself in the anomalous position of representing adverse parties must scrupulously obsèrve and fulfill his duties to both. And, among other duties which a broker owes to his principal is that of keeping his customer fully informed of all facts pertinent to the transaction.

6. In the limited situations where the purchaser retains a broker to serve as his agent, the fiduciary duty attaches. In these cases, the purchaser agrees to pay the broker's fees.

7. Nevertheless, courts have recognized other bases for the imposition of legal liability on the broker for misconduct that causes damage to the purchaser. *See, e.g., Byrn v. Walker,* 275 S.C. 83, 267 S.E.2d 601 (1980) (broker held liable for misrepresentation of structural condition of home); *Easton v. Strassburger,* 152 Cal.App.3d 90, 199 Cal. Rptr. 383 (1984) (broker held liable for non-disclosure of property's soil problems and history of mud slides).

through "constructive fraud." [8]

We agree with the appellants. The evidence was insufficient as a matter of law to establish a fiduciary relationship between Freeman & Kagan and the Holdens. Mr. Holden admitted that there was no written agreement between the Holdens and Freeman & Kagan. Nor was there any express verbal agreement between them. Rather, the Holdens seek to establish an agency relationship on the basis of "a mutually understood inference" that Valliant was working on their behalf by finding houses for them to view. Mr. Holden recited the following statements by Valliant as proof of their agreement or understanding:

"I'm really working to find you the house you want."

"We really want to get the kind of people that you are in Talbot County."

"I know you're a nice family. We would really like to have you all up here. I really would like to see you up here."

In addition, Holden testified, "We were, frankly, very fond of Charlotte."

We note, however, that good salesmanship and fondness do not an agency make. "Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) Agency* § 1 (1958). Three elements are integral to any agency relationship: (1) the agent is subject to the principal's right of control; (2) the agent has a duty to act primarily for the benefit of the principal; and (3) the agent holds a power to alter the legal relations of the principal. *Schear v. Motel Management Corp.*, 61 Md.App. 670, 687, 487 A.2d 1240 (1985) (citing *Restatement (Second) Agency* §§ 12–14). When an agency

---

**8.** For the distinction, if any, between a fiduciary and a confidential relationship, see *Restatement (Second) Trusts* § 2 (1959).

relationship is to be inferred from the parties' conduct, the party alleging the agency has the burden of proving its existence and its nature and extent. *Id.* (citing *Medical Mut. Liab. Ins. Soc'y v. Mutual Fire, Marine and Inland Ins. Co.*, 37 Md.App. 706, 713, 379 A.2d 739 (1977), *cert. denied*, 282 Md. 736 (1978)). We conclude from our review of the record that the Holdens failed to produce any evidence from which a reasonable inference could be drawn that an agency relationship had been created.

■ We reiterate the general rule that a real estate broker or salesperson is an agent for his principal, with incumbent fiduciary duties to that person alone. The broker cannot act for both the seller and buyer in the same transaction because of the potential conflict of interest. The broker here, Freeman & Kagan, was necessarily the agent of the seller. It was the listing broker; its contract was with the seller, its duties were to the seller. The Holdens were merely potential customers for the home it was engaged to sell. Valiant, as an agent of Freeman & Kagan, necessarily shared that same status throughout the transaction and, thus, she too became an agent of the sellers, the Proctors. As agent of the sellers, she could not act for the buyers in the same transaction because of the potential conflict of interest.

In the case at bar, the Holdens failed to present sufficient evidence to take this case outside the aforegoing principle. We hold, therefore, that the trial court erred in submitting the issue of a breach of fiduciary duty by Freeman & Kagan to the jury.

In light of our disposition of this issue, we need not address other issues raised by Freeman & Kagan.

JUDGMENT ON COUNT I AFFIRMED; ON COUNT II REVERSED; COSTS TO BE DIVIDED ½ TO PROCTOR; ½ TO HOLDEN.