984 A.2d 329

WILKENS SQUARE, LLLP, et al.

v.

W.C. PINKARD & CO., INC. t/a Colliers Pinkard.

No. 707, Sept. Term, 2008.

Court of Special Appeals of Maryland.

Nov. 30, 2009.

258

Andrew D. Levy (Shelly M. Martin, Brown, Goldstein & Levy, LLP on the brief), Baltimore, for appellant.

Melissa R. Roth (Jeffrey D. Herschman, DLA Piper on the brief), Baltimore, for appellee.

Panel: DEBORAH S. EYLER, GRAEFF, KEHOE, JJ.

DEBORAH S. EYLER, J.

In the Circuit Court for Baltimore City, W.C. Pinkard & Co., Inc. ("Colliers Pinkard"), the appellee, sued Wilkens Square, LLLP, and Stone Associates, Inc. (together "Wilkens"), the appellants, for breach of contract, to recover an unpaid broker's fee in connection with the sale of an office building by Wilkens to Charles McCann Investments ("CMC"). Wilkens counterclaimed against Colliers Pinkard on several legal theories. The case was tried to a jury, which found in favor of Colliers Pinkard on the breach of contract claim, awarding it $226,321.67 in damages, and found against Wilkens on its counterclaims.

On appeal, Wilkens poses several questions for review, which we have consolidated and rephrased as follows:

I.  Did the trial court err by not ruling, as a matter of law, that Colliers Pinkard was in a dual agency with Wilkens and CMC during times relevant to this case?

II. Did the trial court err by not ruling, as a matter of law, that Colliers Pinkard's relationship with CMC was a material fact that Colliers Pinkard had a duty to disclose to Wilkens at the outset of their business relationship?

III. Did the trial court err by not giving requested jury instructions and by giving the jury a special verdict sheet that was incorrect? [1]

For the following reasons, we shall affirm the judgment entered on the jury's verdict.

## FACTS AND PROCEEDINGS

Because two of the issues presented raise, in effect, legal sufficiency questions, we shall summarize the facts adduced at trial in the light most favorable to Colliers Pinkard, as the prevailing party below. To the extent the third issue requires us to view any of the facts through a different lens, we shall do so in our discussion of that issue.

The business entities and their representatives were, at the relevant times, as follows. Colliers Pinkard is a commercial

---

1. Wilkens framed its questions presented as follows:
   1. From 2004 until at least the end of 2005, Colliers Pinkard acted as a paid buyer's agent for a company interested in purchasing office buildings in Baltimore. Prior to the expiration of that agreement, Colliers Pinkard entered into an agreement to act as a seller's agent to sell Wilkens Square's Baltimore office building. Did the six-week period in which those agreements overlapped constitute a dual agency as a matter of law?
   2. If the answer to Question 1 is "no," does the answer change as a result of any of the following facts?
   a. At the time Colliers Pinkard entered into the agreement to sell the building for its second principal (Wilkens Square), it intended to actively market the property to its first principal, which subsequently confirmed in writing that it had an "active interest in pursuing" the property;
   b. The commission, if any, that the first principal was obligated to pay was contingent on the amount of the commission to be paid by the second principal; and
   c. All of this occurred without the knowledge of the second principal.
   3. Whether or not characterized as a "dual agency," was the existence and terms of Colliers Pinkard's relationship with its first principal material information that Colliers Pinkard, as a fiduciary, had a duty as a matter of law to disclose to its second principal at the commencement of their relationship?
   4. Did the trial court improperly limit the jury's consideration of the issues by referring in the jury instructions and verdict sheet only to the duty to disclose a dual agency and not the duty to timely disclose all material information?

real estate broker in Baltimore City. Ordinarily, it represents sellers of commercial properties. The Colliers Pinkard principals primarily involved in the transactions at issue here were Philip Iglehart and Dennis Malone. CMC is an investment company, based in Ireland, that in 2004 began looking to purchase commercial property in the Baltimore City/Washington, D.C. area. Its local representative and lawyer is Patrick Donnelly. Wilkens and its principal, Daniel Stone, were members of a limited partnership that owned 300 W. Pratt Street, an office building in Baltimore City ("the Pratt Street Property" or "the Property").

In early 2005, Colliers Pinkard and CMC entered into a Brokerage Agreement for Colliers Pinkard to represent CMC's interests in the purchase of commercial property in the Baltimore City/Washington, D.C. area. Under the Brokerage Agreement, CMC paid Colliers Pinkard a monthly fee (at first, $2,500, and later, $5,000) to identify potential investment properties in the $20 million dollar and above price range. According to the involved principals of Colliers Pinkard and CMC, the Brokerage Agreement applied only to potential investment properties for which Colliers Pinkard was *not* the listing agent.

The Brokerage Agreement provided that, in addition to the monthly retainer, CMC would pay Colliers Pinkard a commission on any sale to CMC that resulted from Colliers Pinkard's efforts. The agreement further provided that, for any given sale, if Colliers Pinkard were able to persuade the property seller to pay the commission in an amount equal to or greater than "the suggested CMC discounted fee," Colliers Pinkard would "not seek remuneration from CMC." In other words, if Colliers Pinkard could obtain its commission (or more) from the seller of commercial property to CMC, CMC would not be obligated to pay a commission to Colliers Pinkard.

By August 2005, the business relationship between Colliers Pinkard and CMC had not proven fruitful and the entities decided to bring it to an end. They agreed that the Brokerage Agreement would remain in effect until the end of 2005,

during which time CMC would continue paying Colliers Pinkard the monthly fee; and then the Brokerage Agreement would expire. Indeed, that is what happened, and the Brokerage Agreement came to an end as of December 31, 2005.

In the meantime, Wilkens, through Stone, decided to put the Pratt Street Property up for sale. After a few months of marketing the Property on his own, without success, Stone approached Colliers Pinkard about serving as Wilkens's broker in the sale of the Property. Colliers Pinkard agreed and, on November 18, 2005, the entities entered into a Listing Agreement for the sale of the Property.

In early December 2005, representatives of CMC traveled to the United States to inspect potential commercial investment properties. On December 7, 2005, the CMC representatives met with Iglehart and Malone of Colliers Pinkard to view a number of properties in the Baltimore area. The Pratt Street Property was not one of them. At one point during the visit, Colliers Pinkard representatives told the CMC representatives they might want to look at the Pratt Street Property, even though it was priced below their target value for potential investment properties. The CMC representatives then visited the Property, but not in the company of anyone from Colliers Pinkard. Thereafter, the CMC representatives informed the Colliers Pinkard representatives, by e-mail, that they would be interested in receiving additional information about the Property.

The Pratt Street Property was to be sold by means of a "controlled auction," which is a common practice in commercial real estate sales. As Wilkens's broker under the Listing Agreement, Colliers Pinkard made the arrangements for the auction. It prepared an Executive Summary for the Property, from which potential buyers would learn basic relevant information. That summary was publicly distributed on December 15, 2006. If a potential buyer expressed interest in the Property, Colliers Pinkard would send it a confidentiality agreement to execute. It was Colliers Pinkard's practice that, upon receipt of a signed confidentiality agreement from a

potential buyer, it would send the potential buyer an Offering Memorandum, which was a detailed disclosure about the Property.

Because the CMC representatives had expressed interest in the Pratt Street Property, Colliers Pinkard added CMC to the list of potential buyers for the Property and sent it a copy of the Executive Summary. In early January 2006, after the Executive Summary had been mailed out to all potential buyers, Colliers Pinkard began contacting the various entities that had responded to the mailing to obtain signed confidentiality agreements before mailing the Offering Memorandum. On January 18, 2006, CMC executed a confidentiality agreement, which Colliers Pinkard received. Soon thereafter, CMC was mailed the Offering Memorandum. CMC was one of 48 entities to receive the Offering Memorandum.

The first round of bids on the Pratt Street Property took place on February 3, 2006. CMC was one of five bidders, and its bid of $12.5 million was the second highest.

On February 6, 2006, Malone of Colliers Pinkard met with Stone of Wilkens to discuss the bids that had come in from each potential buyer. At that meeting, in response to an inquiry, Malone told Stone about the Brokerage Agreement between Colliers Pinkard and CMC. Specifically, Malone explained that Colliers Pinkard had contracted with CMC to help it locate potential investment properties to purchase, and that the contract had expired as of the end of 2005. Stone memorialized that conversation in a note to himself, in which he also wrote that Wilkens should proceed with the second round of bidding, "get [the] CMC final proposal," and then inquire more about the business relationship between CMC and Colliers Pinkard. He further noted that if, at that time, he thought the prior contract between CMC and Colliers Pinkard posed a problem, he would have to decide whether to go forward with a sale to CMC or to go forward with a sale to another bidder; and if he thought there was no problem, he would "proceed."

The second round of bidding was held on February 23, 2006. The bids were submitted on invitation by Wilkens, through Colliers Pinkard, as its broker. Invitations were extended only to three entities, one of which was CMC. Stone's decision to include CMC as one of the second round bidders was made after the February 6, 2006 meeting. As it turned out, one of the three invited bidders dropped out before the second bidding round, leaving only two entities (including CMC) to participate in that round. Both participants submitted increased bid amounts. CMC's bid, for $13,175,000, was the high bid, by $725,000.

In late February 2006, after the second round bids were received, Stone instructed Colliers Pinkard that, from that point on, he would handle the negotiations with CMC on his own. On March 1, 2007, Stone met with representatives of CMC and tried to persuade them to increase their bid. They refused and the sales price remained $13,175,000.

Stone informed representatives of CMC that, before a sales contract would be executed, he wanted to see a copy of the Brokerage Agreement between Colliers Pinkard and CMC. He also asked CMC to pay Colliers Pinkard's commission. CMC refused to pay the commission, on the ground that Colliers Pinkard had not acted and was not acting as its broker in the transaction in question (*i.e.*, the sale of the Pratt Street Property); to the contrary, Colliers Pinkard was acting as Wilkens's broker in that transaction. CMC representatives confirmed for Stone that its Brokerage Agreement with Colliers Pinkard had expired on December 31, 2005. On April 27, 2006, CMC e-mailed Stone a copy of the expired Brokerage Agreement. The final contract of sale for the Property by Wilkens to CMC was executed the next day. Stone had read the Brokerage Agreement before then.

On May 24, 2006, in anticipation of the settlement on the sale of the Pratt Street Property, Colliers Pinkard sent Wilkens an invoice for $226,321.67, its commission as calculated under the terms of the Listing Agreement. Closing took

place on June 14, 2006.[2]  Thereafter, Wilkens failed to pay Colliers Pinkard's commission, notwithstanding demand.

On July 3, 2006, in the Circuit Court for Baltimore City, Colliers Pinkard filed a one-count breach of contract action against Wilkens, seeking payment of its commission.  Wilkens filed a counterclaim for breach of contract and negligence.  It later amended its counterclaim to add claims for intentional concealment of material facts and conspiracy by a fiduciary.

The case was tried to a jury from October 24, 2007, to November 2, 2007.  It was submitted to the jury for decision by way of a special verdict sheet.  The jurors returned their verdict, finding 1) that Colliers Pinkard proved by a preponderance of the evidence that Wilkens had breached the Listing Agreement by failing to pay the commission;  2) that Wilkens had not proved "by a preponderance of the evidence that Colliers Pinkard engaged in a dual agency by representing both [Wilkens and CMC in the sale of the Property]";  and 3) that Colliers Pinkard was entitled to $226,321.67 in damages for the breach of contract.  The jurors returned verdicts against Wilkens on each of its counterclaims, determining that Colliers Pinkard did not breach its duties to Wilkens arising out of the Listing Agreement by failing to properly market the Property or to properly support its underwriting assumptions; that Colliers Pinkard did not breach a fiduciary duty to Wilkens;  and that Colliers Pinkard did not enter into a conspiracy with CMC.

The court entered judgment on the jury verdict.  Wilkens filed a timely motion for judgment notwithstanding the verdict or for new trial, which was denied.  This appeal followed.

We shall include additional facts as pertinent to our discussion of the issues.

---

2.  At the relevant times, the 300 West Pratt Street Limited Partnership owned the Property.  When the Property was sold, CMC purchased it by buying the partnership interests in the limited partnership.

## DISCUSSION

### I.

### Wilkens's Affirmative Defense of Dual Agency

At trial, Wilkens did not contest Colliers Pinkard's evidence on its claim for breach of the Listing Agreement. Rather, Wilkens raised the affirmative defense of dual agency. It sought to prove that Colliers Pinkard acted as a real estate broker for it (Wilkens) and as a real estate consultant for CMC and therefore, under Maryland law, and also under a term peculiar to the Brokerage Agreement, Colliers Pinkard forfeited its contractual right to a broker's fee under the Listing Agreement. At the close of all the evidence, Wilkens moved for judgment on that ground. The court denied the motion.

Wilkens challenges that ruling on appeal. It acknowledges that it bore the burden of proving dual agency. It argues that it not only met its burden, it adduced such powerful evidence as to compel a finding, as a matter of law, that Colliers Pinkard was in a dual agency relationship with it and with CMC from November 18, 2005, until December 31, 2005. For that reason, the court should have ruled that Colliers Pinkard forfeited its contractual right to a broker's commission on the sale of the Pratt Street Property, and not submitted that issue to the jury for decision. In essence, Wilkens maintains that, on the evidence about dual agency and the reasonable inferences it supported, reasoning minds only could find that Colliers Pinkard occupied a prohibited dual agency role vis-à-vis the Pratt Street Property.

Colliers Pinkard counters that the court did not err by denying Wilkens's motion for judgment and sending the issue of dual agency to the jury for decision; and, if anything, the evidence was legally insufficient to support a rational finding that there was a dual agency relationship in this case.[3] Col-

---

3. At trial, Colliers Pinkard moved for judgment on that basis. Its motion, like Wilkens's, was denied.

liers Pinkard maintains that, to prove a dual agency that would trigger a forfeiture of its commission on the sale of the Pratt Street Property, Wilkens had to show that Colliers Pinkard was representing Wilkens and CMC in the same transaction (the sale of the Pratt Street Property) at the same time. It argues that, because the evidence before the jury would permit (if not require) a reasonable finding that it was not acting on behalf of Wilkens and CMC in the same transaction, the trial court would have erred by granting Wilkens's motion for judgment at the end of the case. Colliers Pinkard also maintains, more generally, that prohibited dual agencies that result in the forfeiture of a broker's commission do not arise merely because the broker at one time represented both parties in question, not in connection with the particular transaction, or represented both of the parties but at different times.

We review a trial court's decision to deny a motion for judgment at the conclusion of the evidence *de novo*. *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md.App. 662, 682–83, 920 A.2d 546 (2007). As noted above, Wilkens bore the burden of proving its dual agency defense. *See Wells Fargo Home Mortg., Inc. v. Neal*, 398 Md. 705, 730 n. 12, 922 A.2d 538 (2007) ("As with all affirmative defenses, [the defendant] bears the burden of proof."). Thus, on appeal, we must determine whether the evidence adduced at trial, viewed in a light most favorable to Colliers Pinkard as the prevailing party, was such as to compel a factual finding of dual agency, *i.e.*, that reasonable jurors only could find that a dual agency existed. *Cavacos v. Sarwar*, 313 Md. 248, 258–59, 545 A.2d 46 (1988); *McQuay v. Schertle*, 126 Md.App. 556, 569, 730 A.2d 714 (1999). *See also* Md. Rule 2–519(b). If reasonable minds could find one way or the other, the trial court's decision to deny Wilkens's motion for judgment was not in error.

A real estate broker stands in a fiduciary relationship to his client. *Silverman v. Kogok*, 239 Md. 71, 76, 210 A.2d 375 (1965) (citing *Coppage v. Howard*, 127 Md. 512, 521, 96 A. 642 (1916), and Restatement (Second) Of Agency § 13)). *See*

*also Yerkie v. Salisbury,* 264 Md. 598, 603, 287 A.2d 498 (1972) (observing that "when a seller employs a broker to sell his property he bargains for the disinterested skill, diligence and zeal of the broker for his own exclusive benefit"); *Sellner v. Moore,* 251 Md. 391, 398, 247 A.2d 523 (1968).

Absent the knowing consent of the parties to a real estate transaction, the broker's fiduciary relationship with his client precludes a "dual agency," that is, the same broker representing both sides in the transaction. This is so because, ordinarily, the interests of the parties on the two sides of such a transaction are diametrically opposed. "The principle . . . is that a broker cannot act for both a seller and purchaser without the full knowledge and consent of each, because their interests are in conflict. That is undeniably the law. . . ." *Blake v. Stump,* 73 Md. 160, 172, 20 A. 788 (1890), *quoted in Slagle v. Russell,* 114 Md. 418, 427, 80 A. 164 (1911). *See also Raisin v. Clark,* 41 Md. 158, 160 (1874) ("[T]he law will not permit an agent of the vendor whilst that employment continues, to assume the essentially inconsistent and repugnant relation of agent for the purchaser."); *Schwartze v. Yearly,* 31 Md. 270, 277–78 (1869) ("An agent, as a general rule, will not be permitted to act for both sides.").

In *Silverman, supra,* the Court commented upon the absolute conflict that exists when a broker represents both parties to the sale of real estate:

> A broker is a fiduciary. Because the interests of prospective seller and buyer as to price are necessarily adverse, the law will not permit an agent of the vendor, while the employment continues, to assume "the essentially inconsistent and repugnant relation of agent for the purchaser." *A fortiori,* the principle applies where the agent himself is the purchaser [unless the agreement allows it].

239 Md. at 76, 210 A.2d 375 (citations omitted). Thus, the positions of the opposing parties to a real estate sale are so inherently in conflict that, in the absence of consent, the broker's fiduciary duty always will be violated. It was for this reason that by common law (and later in the case of residen-

tial real estate sales, by statute), Maryland came to recognize the principle that a broker cannot profit from a transaction in which he represents opposing parties.[4] It is inevitable in that circumstance that the dual agency relationship will cause harm to one, if not both, parties; and a fiduciary who has harmed his principal must not benefit from doing so.

Accordingly, a broker in a dual agency that is not consented to by both principals cannot recover a commission from either party to the transaction, as any commission paid would amount to a benefit conferred on a fiduciary who violated his duty in the transaction. *See, e.g., Holzman v. Fiola Blum, Inc.,* 125 Md.App. 602, 628, 726 A.2d 818 (1999) ("[I]f a broker breaches his or her fiduciary duty, acts in bad faith, or in another opprobrious manner, he or she may forfeit the right to compensation.") Because the inherent conflict that gives rise to this strict rule of forfeiture exists when there is one transaction in which the broker is representing opposing sides, it is not surprising that in all the Maryland cases on the topic, the broker in question was representing the parties on the opposite sides of a particular transaction (or was one of the parties on one side of the transaction while acting as broker for the other party). There are no Maryland dual agency cases that extend the commission forfeiture rule to situations in which a real estate broker has represented two parties at the same time in different transactions or has represented two parties to a transaction at different periods of time.[5]

---

**4.** *See* Md.Code (2004 Repl.Vol., 2009 Supp.) section 17–530(c) of the Business Occupations and Professions Article, which prohibits real estate brokers from acting as dual agents in residential real estate transactions unless the broker "obtains the written informed consent of all parties" to the transaction as outlined in section 17–530(d).

**5.** In *Raisin v. Clark,* 41 Md. 158 (1874), a broker sued the buyer of a farm for an unpaid commission. It was undisputed that the broker had represented the seller in the sale of that property, and that the seller had paid the broker a commission. The broker claimed to have represented the buyer too. The broker lost in a jury trial. The Court of Appeals affirmed, saying that a broker cannot represent the parties on opposite sides in "the same transaction." *Id.* at 159.

In *Blake v. Stump*, 73 Md. 160, 20 A. 788 (1890), a broker sued a seller of residential real estate for his unpaid commission. The seller introduced evidence that could support a reasonable finding that, without the seller's knowledge, the broker had acted on behalf of the seller *and* the buyer in the sale of the property. The seller sought, unsuccessfully, an instruction that the broker could not recover his commission if in pursuit of his employment by the seller he conducted negotiations with the buyer. A jury found in favor of the broker. The Court of Appeals reversed and remanded for a new trial, explaining that the sought after instruction was a proper statement of the law that had been generated by the evidence.

In *Coppage v. Howard*, 127 Md. 512, 96 A. 642 (1916), a real estate broker sued a property owner, his client, for an unpaid commission. The broker had brought a ready, willing, and able buyer to the table, so he said, but would not disclose the buyer's identity. The seller refused to sell the property with the identity of the buyer unknown. In a bench trial, the court sided with the broker and awarded him his commission. The Court of Appeals reversed, holding that the seller was entitled to know the identity of the buyer, and if it were not disclosed, was entitled to act on the assumption that the broker himself was the buyer, in which case the broker was not entitled to a commission because he was acting for both sides in one transaction.

In *Slagle v. Russell*, 114 Md. 418, 80 A. 164 (1911), a broker sued property sellers, his clients, for an unpaid commission. During the negotiations leading to the sale, unbeknownst to the sellers, the broker tried to get a particular buyer to purchase the property with him (the broker). In the course of doing so, during the time the sale was being negotiated, the broker gave the buyer information about what the sellers hoped to obtain in the sale. Eventually, the buyer bought the property alone, at a price lower than what the sellers had wanted. At trial, the court refused to give the jury a dual agency instruction, and the jury returned a verdict for the broker. The Court of Appeals reversed, holding that the jury could have found a dual agency, and thus denied the broker his commission, based on the evidence that the broker initially solicited the buyer as a co-purchaser.

In *Stokes v. Wolf*, 137 Md. 393, 112 A. 566 (1921), the seller, on appeal from a verdict awarding a commission to his broker, argued that, if there was a brokerage agreement between the seller and the broker respecting the property, the broker, without the seller's knowledge, had been acting on behalf of the putative buyer and therefore was not entitled to a commission. The Court agreed that if such a dual agency were proven, the broker would not be entitled to his commission, but affirmed the broker's award because that legal theory was not raised below.

In *Hardy v. Davis*, 223 Md. 229, 164 A.2d 281 (1960), a property seller sued his broker for breach of a duty to disclose. The broker had represented the seller in the sale of a property, and also had lent the buyer money to use in purchasing the property. The broker prevailed on summary judgment. The Court of Appeals affirmed, holding that the broker was not in a conflict or dual representation respecting the transaction as a matter of law because the broker did not possess

██ Moreover, the holding in *Ricker v. Abrams*, 263 Md. 509, 283 A.2d 583 (1971), makes plain that proof of dual agency must consist of evidence that the broker represented the opposite sides to a transaction when the transaction took place. In that case, a broker sued the seller of a package goods store (personalty) for an unpaid commission. The broker had approached the seller to see if she wanted to sell her business, knowing that a client he had represented in the recent sale of a liquor store wanted to go back into that type of business. The seller said she did and gave the broker information about the terms of the sale she was seeking. The broker then introduced his former client, the buyer, to the seller. The seller and the buyer negotiated on their own. They reached an agreement and closed on the sale of the business without the broker's knowing.

When the broker found out about the sale, he sued both the seller and the buyer to recover commissions allegedly agreed to. The broker's position was that he never acted for the buyer, only for the seller; but if he had acted for the buyer, it was with the seller's consent. The case was tried to a jury. The buyer was granted a directed verdict (now a motion for judgment). The jury returned a verdict in favor of the broker and against the seller, awarding the broker his commission.

On appeal, the seller argued *inter alia* that the broker had acted as a dual agent and therefore had forfeited any commis-

---

undisclosed information about the buyer's financial status or make the loan while he was acting as the seller's agent.

In *Silverman v. Kogok*, 239 Md. 71, 210 A.2d 375 (1965), a real estate broker sued for specific performance for the sale of property. The broker had an exclusive listing contract with the seller (an estate). Without the seller's knowledge, the broker also had entered into a conditional contract to purchase the property if it were not sold at the offered price within 90 days. When the property was not so sold, the broker demanded that the seller convey the property to him. The trial court denied specific performance and the Court of Appeals affirmed. It held that the broker, as agent for the seller in the sale of the property and as conditional purchaser of the same property, was in an inherently conflicted relationship with the seller; specifically, during the pertinent time, it had been in the broker's interest for the seller not to obtain the seller's asking price for the property.

sion he might have earned. In affirming the judgment for the broker, the Court of Appeals remarked that the directed verdict in favor of the buyer meant that the "dual agency point made by [the seller] on appeal falls of its own weight." *Id.* at 515, 283 A.2d 583. Because as a matter of law the broker did not represent the buyer in the transaction at issue, *i.e.,* the one in which the commission was being sought, there could not be a dual agency. Either the broker had acted only for the seller, and was entitled to the commission, or he had not been acting for either the seller or the buyer, and was not entitled to any commission. It did not matter that the broker former-ly had represented the buyer in the recent sale of another similar property.

■ The evidence in the case at bar was undisputed that Colliers Pinkard did not represent CMC in the sale of the Pratt Street Property, on June 14, 2006, and indeed did not represent CMC in any capacity after December 31, 2005. The evidence also was undisputed that Colliers Pinkard in fact represented Wilkens in the sale of the Pratt Street Property, and in the auction process that led to the sale of the Property to CMC. Under the holding in *Ricker,* and consistent with all of the Maryland dual agency cases, as a matter of law, Colliers Pinkard was not representing both sides to Pratt Street Property sale when the sale went forward or when the auction that resulted in the sale was held, and therefore was not in a dual agency respecting that transaction. When the auction and sale of the Pratt Street Property took place, Colliers Pinkard was representing one party to the transaction (Wilk-ens) and not the other (CMC). Under *Ricker,* there was not a dual agency when the sale took place, when the auction was held, or at any time after December 31, 2005, as a matter of law.

The sole evidence at trial that showed that Colliers Pinkard had any business relationship with CMC at the same time it had a business relationship with Wilkens was that, from mid-November, 2005, until December 31, 2005, Colliers Pinkard had a contract (the Brokerage Agreement) with CMC to

render general real estate purchase consulting services and also had a contract (the Listing Agreement) with Wilkens to market the Pratt Street Property for sale. The mere co-existence of the two contracts did not constitute a dual agency under Maryland law. As we have explained, the dual agency commission forfeiture rule, which is what Wilkens was seeking to have imposed, exists as a disincentive to brokers from engaging in conduct, such as opposite side representation, that, absent consent, plainly is a breach of their fiduciary duties. Here, there was no inherent conflict in Colliers Pinkard's contracts with the two entities. It could properly perform its obligations under both contracts without necessarily breaching a fiduciary duty to one client or the other.

The only evidence adduced at trial that linked the Colliers Pinkard contracts with CMC and with Wilkens to the Pratt Street Property was that, in mid-December 2005, Colliers Pinkard recommended to CMC that its representatives view the Property, and that, later that same month, in response to CMC's expressed interest in the Property, Colliers Pinkard, as broker for Wilkens, added CMC to the list of entities to receive the Executive Summary about the Property. Wilkens argues that, by recommending that CMC's representatives view the Pratt Street Property, even though it was not valued in the $20 million dollar range, Colliers Pinkard was rendering real estate brokerage services to CMC, for a fee, respecting the purchase of the Pratt Street Property, at the same time it was representing Wilkens with respect to the sale of the same Property. Specifically, Wilkens asserts that Colliers Pinkard, by serving as a consultant to CMC with respect to the purchase of the Property, was providing "real estate brokerage services" to CMC as that term is defined by Maryland Code (2004 Repl.Vol., 2009 Supp.), section 17–101(*l*) of the Business Occupations and Professions Article ("BOP").[6]

---

**6.** BOP section 17–101(1) provides:

"Provide real estate brokerage services" means to engage in any of the following activities:

This argument is flawed in several respects. To start, the representatives of Colliers Pinkard and CMC testified that the Brokerage Agreement did not apply to any transaction in which Colliers Pinkard was the listing agent. This testimony was uncontroverted, and we must view it in a light most favorable to Colliers Pinkard. Accordingly, Colliers Pinkard's recommendation that CMC look at the Pratt Street Property did not constitute "serving as a consult [for consideration]" pursuant to BOP section 17–101($l$), because it did not fall within the purview of the Brokerage Agreement.

Although Wilkens points to Malone's testimony that Colliers Pinkard understood that the agreement with CMC "was meant to put all properties that we [Colliers Pinkard] were familiar with and thought were good purchases in front of them ... [w]hether we listed them or not," in the latter portion of that statement, omitted by Wilkens, Malone continues, "Well, then when [the Pratt Street Property] comes along, this is slightly different because we have to represent the seller, so we can't represent your [CMC's] interest." Thus, Malone's testimony is consistent with the understanding of Colliers Pinkard and CMC that when CMC expressed an interest in a property for which Colliers Pinkard was the listing agent, the Brokerage Agreement did not apply and Colliers Pinkard would act exclusively on behalf of the seller.

---

(1) for consideration, providing any of the following services for another person:
(i) selling, buying, exchanging, or leasing any real estate;  or
(ii) collecting rent for the use of any real estate;
(2) for consideration, assisting another person to locate or obtain for purchase or lease any residential real estate;
(3) engaging regularly in a business of dealing in real estate or leases or options on real estate;
(4) engaging in a business the primary purpose of which is promoting the sale of real estate through a listing in a publication issued primarily for the promotion of real estate sales;
(5) engaging in a business that subdivides land that is located in any state and sells the divided lots;  or
(6) for consideration, serving as a consultant regarding any activity set forth in items (1) through (5) of this subsection.

Moreover, even if Colliers Pinkard's recommendation that CMC look at the Pratt Street property was made pursuant to the Brokerage Agreement, that action was not sufficient to make Colliers Pinkard a dual agent. As we explained, the dual agency prohibition stems from the inherent conflict between the interests of buyer and seller, such that when the broker acts in accordance with his fiduciary duty to one party he invariably breaches his duty to other. *See, e.g., Silverman, supra,* 239 Md. at 76, 210 A.2d 375. Here, Colliers Pinkard's agreement to present properties to CMC was not in conflict with its fiduciary obligations to Wilkens under the Listing Agreement. The mere recommendation that CMC consider properties worth less than $20 million generally, and that it consider the Pratt Street property specifically, did nothing to further CMC's interest in purchasing the property, nor could it possibly be construed as adverse to Wilkens's interest in selling the property. *See Hardy v. Davis,* 223 Md. 229, 233, 164 A.2d 281 (1960) (" 'An agent can properly deal with the other party to a transaction if such dealing is not inconsistent with his duties to the principal.' " (quoting RESTATEMENT (SECOND), AGENCY § 391, cmt. b)); *Proctor v. Holden,* 75 Md.App. 1, 20, 540 A.2d 133 (1988) ("[G]ood salesmanship and fondness do not an agency make.").[7] Stated another way, Colliers

---

**7.** In *Proctor,* the buyers sued the seller's broker to recover their deposit, arguing that the broker had entered into a fiduciary relationship with them (the buyers) for the purchase of a home that the broker was also listing. The buyers sought to establish a fiduciary relationship with the broker through evidence of "a mutually understood inference" that the broker was working on their behalf to locate a house for them. 75 Md.App. at 20, 540 A.2d 133. The court held that the broker's statements to the buyers that she was "really working" to find them a house and that she wanted them to live in the area were insufficient as a matter of law to establish an agency relationship. *Id.* at 20, 540 A.2d 133. The buyers were "merely potential customers for the home it [the broker] was engaged to sell." *Id.*

The present case is distinguished by the existence of the Brokerage Agreement, which plainly made Colliers Pinkard CMC's agent for the purpose of locating properties generally, and (as implemented by the parties to the agreement) purchasing properties that Colliers Pinkard did not list. Colliers Pinkard's presentation of a property pursuant to this agreement, however, was not sufficient to make it an agent of CMC

Pinkard never acted as CMC's agent with respect to the sale of the Pratt Street Property, and thus could not have been a dual agent for the purpose of that transaction. In fact, the most logical inference to be drawn from the evidence presented is that Colliers Pinkard, in recommending that CMC look at the Property, was acting in its capacity as listing agent for the Property, and thus seeking to advance the interests of Wilkens. At the very least, we cannot say that this evidence was sufficient to require a finding of dual agency as a matter of law.

On the contrary, we question whether the evidence was legally sufficient to support any finding that Colliers Pinkard was in a dual agency with CMC and Wilkens respecting the Pratt Street Property and its ultimate sale. In any event, the trial court submitted the dual agency question to the jury for decision (and the jury found that there was no dual agency). Without question, the evidence was not such as to compel a reasonable jury only to find that a dual agency existed. Reasonable jurors could have found that the coexistence of the two contracts, Colliers Pinkard's recommendation to CMC that it view the Pratt Street Property, and Colliers Pinkard's taking steps to mail the Executive Summary about the Property to CMC after its representatives expressed interest in the Property did not constitute a dual agency, *i.e.,* one in which the real estate agent was representing the opposite sides of a transaction, necessarily breaching its fiduciary duties to one party or the other in doing so.

Finally, Wilkens argues that the provision of the Brokerage Agreement between Colliers Pinkard and CMC respecting the payment of commissions created a dual agency; and, had it known of this arrangement, it could have at least negotiated a

---

with respect to the purchase of that property. Thus, just as the broker's encouragement to the buyer in *Proctor* was insufficient to create a fiduciary relationship, Colliers Pinkard's recommendation that CMC look at the Pratt Street Property did not create an agency relationship between them with regard to the purchase of the Property. With respect to that transaction, CMC was "merely [a] potential customer[ ]" for a property Colliers Pinkard was engaged to sell.

discounted commission with CMC. As noted above, under that agreement, if the seller in a transaction in which Colliers Pinkard was representing CMC as the buyer was willing to pay Colliers Pinkard's commission (or a higher commission), CMC no longer would be obligated to pay the commission itself. As also noted, however, the uncontroverted testimony at trial was that the Brokerage Agreement did not apply to any transaction in which Colliers Pinkard was the listing agent. Furthermore, Patrick Donnelly, CMC's attorney in Baltimore, testified that he represented CMC in its effort to acquire the Property, that Colliers Pinkard never acted as an agent for CMC in its acquisition of the property, and that CMC "had no intention of paying Colliers Pinkard a broker's commission." Accordingly, when Stone, shortly after learning of the relationship between Colliers Pinkard and CMC, remarked to representatives of CMC that they should pay Colliers Pinkard's commission, they refused. Thus, Wilkens's argument that the commission agreement between Colliers Pinkard and CMC created a dual agency, and that it (Wilkens) could have negotiated a better deal with CMC had it known of this arrangement, is entirely unsupported by the evidence. Accordingly, the trial court did not err in denying Wilkens's motion for judgment at the close of the evidence on the issue of dual agency.

## II.

### Wilkens's Claim of Breach of Duty to Disclose Material Fact

Wilkens also pursued the affirmative defense of failure to disclose a material fact. In its second contention, Wilkens faults the trial court for not ruling in its favor as a matter of law on that defense. Specifically, Wilkens argues that the court should have found that the evidence established as a matter of law that Colliers Pinkard's prior business relationship with CMC was a material fact that Colliers Pinkard was duty bound to disclose to Wilkens at the outset of their business relationship (*i.e.*, when the Listing Agreement was

signed on November 18, 2005), and that Colliers Pinkard breached that duty. As mentioned above, Wilkens moved for judgment on that ground at the close of the evidence, and the trial court denied the motion.

Colliers Pinkard responds by arguing that Maryland law does not require brokers to disclose to sellers their relationships with potential buyers so long as the broker is not serving as a dual agent. Thus, Wilkens could not seek relief for failure to disclose a material fact other than dual agency. Although we do not agree that Colliers Pinkard's position is a correct statement of the law in general, we do agree that it accurately characterizes the duty to disclose in this case. We explain.

■■■■ A real estate broker cannot represent both parties to the same transaction " 'because of possible conflict between his interest and his duty in such case, and he must disclose to his principal *all facts or information* which may be relevant or material in influencing the judgment or action of the principal in the matter.' " *St. Paul at Chase Corp. v. The Manufacturers Life Ins. Co.*, 262 Md. 192, 215–16, 278 A.2d 12 (1971) (quoting *Hardy v. Davis, supra*, 223 Md. at 232, 164 A.2d 281); *Proctor, supra*, 75 Md.App. at 18, 540 A.2d 133 (quoting the same) (emphasis added). Thus, depending upon the facts and circumstances of the case, there may be information in addition to or other than dual agency that is material to the principal, and therefore must be disclosed by the broker. Failure to disclose such information may likewise result in a forfeiture of the broker's commission *See Holzman, supra*, 125 Md.App. at 628, 726 A.2d 818. This principle is best illustrated by the holding in *Sellner v. Moore*, 251 Md. 391, 247 A.2d 523 (1968).

In *Sellner*, a property seller sued his real estate broker to recoup the commission the broker had been paid upon the sale of the property. The seller alleged that, during the negotiations leading to the sale, the broker had told him that he had received a deposit on a contract from the person who, ultimately, became the buyer of the property. In fact, the broker

himself had paid the deposit for the buyer. The broker did not disclose that fact to the seller, however, and the seller did not learn about it until settlement. As part of the sale, the seller had agreed to finance the balance of the sales price for the buyer.

In a bench trial, the court found in favor of the broker, reasoning that the fact that the broker had paid the deposit for the buyer was not material and therefore the broker was not obligated to disclose it to the seller. The Court of Appeals reversed. It held that the financial circumstances of the buyer was a material fact for the seller to know before the sale because seller financing was a feature of the transaction; it would be important for the seller to know whether the buyer would be able to pay the debt after settlement, and the fact that the buyer did not have funds to pay the deposit was relevant to that point. The Court concluded that the broker's failure to disclose the source of the buyer's deposit was a breach of the broker's fiduciary duty to act in good faith for the interests of the seller; and for that reason, the broker was not entitled to his commission. *Compare with Hardy, supra,* 223 Md. at 232–34, 164 A.2d 281 (holding that the broker did not breach his fiduciary duty to the seller by failing to disclose a loan made to the buyer after the contract was signed when it was conceded that "the broker had no knowledge, or reason to know, the buyers would not make payments as agreed, and no reason to anticipate before the contract was signed that they would seek a loan from him or anyone else.").

As *Sellner* illustrates, dual agency is not the only material information a broker may be duty bound to disclose to his principal; and the materiality of a fact will depend upon the nature of the transaction and the effect, if any, the fact may have on its outcome. In the case at bar, Wilkens took the position that, as a matter of law and as a matter of fact, the existence of the Brokerage Agreement between Colliers Pinkard and CMC was material to its (Wilkens's) decision to enter into the Listing Agreement with Colliers Pinkard, and to keep the Property listed with Colliers Pinkard; therefore,

Colliers Pinkard had a duty to disclose that fact to Wilkens when the Listing Agreement was signed, or at least when CMC expressed interest in the Pratt Street Property in December 2005, which it failed to do. We disagree.

Wilkens's insistence that it wished to know about the CMC–Colliers Pinkard relationship is not alone sufficient to render that information material. Rather, as Wilkens itself argues, we must consider what a reasonable person in the principal's position would wish to know under the facts and circumstances of the transaction in question. There was no objective evidence in this case that Colliers Pinkard's contract with CMC to assist it in purchasing properties in the Baltimore City/Washington D.C. area would have been material to Wilkens with respect to the ultimate sale of its property. As the parties to the CMC–Colliers Pinkard contract testified, the Brokerage Agreement did not cover properties for which Colliers Pinkard was the listing agent; and regardless of whether the language of the Brokerage Agreement said so expressly, the parties to it treated it that way. The evidence was clear that Colliers Pinkard never was in the position of agent to CMC with respect to the Pratt Street Property. The fact that Colliers Pinkard might have been in an agency relationship with CMC if it were to have sought to purchase another property (which did not happen) had no reasonable effect upon Wilkens as the seller of the Pratt Street Property.

In arguing that the CMC–Colliers Pinkard relationship was material information that could have affected its actions, Wilkens points to the testimony by Iglehart, on cross-examination, that, if sellers (in general) knew of Colliers Pinkard's buyer's-broker relationship with CMC, it would have made it more difficult for Colliers Pinkard to represent sellers. Iglehart's general testimony, however, does not establish that knowledge of the CMC–Colliers Pinkard relationship was material or relevant to Wilkens's actions with respect to the transaction at issue. (Moreover, Iglehart's testimony on this point is contradictory—when asked if it "wasn't in [his] interest to advertise [the relationship with CMC]?" Iglehart responded, "I don't know why not.")

The only other specific argument advanced by Wilkens on why the relationship between Colliers Pinkard and CMC was material is that, had it known of the relationship, it could have negotiated a better deal with CMC regarding payment of Colliers Pinkard's commission. Wilkens, however, produced no evidence that the Brokerage Agreement obligated CMC to pay Colliers Pinkard a commission for its purchase of the Property, and regardless, the existence of such evidence simply would have gone to the ultimate question put before the jury of whether there was a prohibited dual agency.

To be sure, if Colliers Pinkard was in a dual agency with CMC and Wilkens respecting the Pratt Street Property, there would have been a fiduciary duty to disclose that fact. For the reasons we have discussed above, it is questionable whether there was any legally sufficient evidence of dual agency in this case; and if there was any at all, the jury decided as a matter of fact that a dual agency did not exist. There simply was no evidence of any other "material fact," *i.e.*, a fact that reasonably would have had an impact one way or the other upon Wilkens's decision to sell the Property to CMC, that Colliers Pinkard had a duty to disclose, but did not. Accordingly, the court did not err by refusing to enter judgment for Wilkens on that basis.

### III.

### Jury Instructions and Verdict Sheet

In its last contention, Wilkens asserts that the trial court's instructions and verdict sheet did not fairly put before the jury the question whether Colliers Pinkard breached its fiduciary duty to Wilkens to disclose all material facts relevant to the transaction. Specifically, Wilkens maintains that the court limited the duty to disclose issue to whether Colliers Pinkard was in a dual agency with CMC and Wilkens, and failed to submit to the jury the question whether Colliers Pinkard breached its disclosure duty to Wilkens by not revealing (before February 2006) the mere existence of its Brokerage Agreement (effective until December 31, 2005) with CMC.

██ We reject this contention for the same reasons we have discussed in our answer to Question II. There was no evidence of any material fact that Colliers Pinkard should have disclosed to Wilkens under the circumstances here other than the possible fact of a dual agency. As Wilkens itself notes, "[a] litigant is entitled to have his theory of the case presented to the jury, but only if that theory of the case is a correct exposition of the law *and there is testimony in the case which supports it." Levine v. Rendler,* 272 Md. 1, 13, 320 A.2d 258 (1974) (emphasis added). *See also Bentley v. Carroll,* 355 Md. 312, 324, 734 A.2d 697 (1999) ("The test for whether an instruction was proper has two aspects: (1) whether the instruction correctly states the law, and (2) whether the law is applicable in light of the evidence before the jury."). Therefore, the court's limitation on the issue submitted to the jury for decision was not in error.[8]

██ Finally, Wilkens asserts that the trial court failed to properly instruct the jury about when disclosure of a dual agency must be made. Wilkens argues that without such an instruction, "the jury could have mistakenly believed that any disclosure, no matter how belated, satisfied Colliers Pinkard's duty to disclose." Colliers Pinkard argues that any instruction on when disclosure was required "would have usurped the role of the jury in determining whether disclosure was required in the first instance, *i.e.,* whether a dual agency existed."

We agree with Colliers Pinkard that an instruction on when disclosure was required necessarily would have assumed a positive answer to the threshold question whether there was a dual agency to begin with. Indeed, Wilkens did not submit a proposed jury instruction on when disclosure should have been made; and, in its brief, it argues only that the court should

---

8. We note that the court's general instruction to the jury on a fiduciary's responsibilities to his or her client stated that, "such persons must make full disclosure to the client[ ] of all facts material to the client[']s decision to accept or reject the proposed transaction." Thus, the trial court was well aware of the general law regarding a broker's duty of disclosure.

have instructed the jury that disclosure needed to made in a "timely manner."

The court did, however, instruct the jury that,

When a client learns that his real estate agent, broker, or salesperson has breached a duty owed to the client, the client may proceed with the sale of the property without waiving any claims against the broker, agent or salesperson if refusing to proceed with the sale was not reasonably practical or would prejudice the client.

In addition, the verdict sheet separately asked a) whether there was a dual agency, irrespective of whether it was disclosed, and b) if so, whether Wilkens had full knowledge of the dual agency and therefore waived its claims based on a failure to disclose. Thus, the jury was aware that a belated disclosure of dual agency would not absolve Colliers Pinkard of any liability on that basis; and, in any event, the jury never reached this question because it found no dual agency to begin with. Accordingly, even if the court had erred by failing to instruct the jury on when disclosure should have been made, the error would not have been prejudicial. *See Wyatt v. Johnson*, 103 Md.App. 250, 260, 653 A.2d 496 (1995) ("In civil cases, an appellate court rarely will reverse for error below unless the error 'was both manifestly wrong and substantially injurious,' and had a prejudicial effect on the outcome of the case.") (citations omitted). *See also K & K Mgmt. v. Lee*, 316 Md. 137, 149–50, 557 A.2d 965 (1989) (holding that the denial of a requested jury instruction was not prejudicial error when, based on the findings of the jury, it would not have reached the issue embodied by the instruction).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**